**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| KENNETH DALLA COSTA and | ) | |
| DEBORAH DALLA COSTA, individually | ) | |
| and as the parents and next friends of AA, | ) | |
| BB, and CC, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 21-cv-5165 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| VEENA RAMAIAH, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Kenneth and Deborah Dalla Costa lost custody of their children, twice, due to abuse allegations. The first time, the state of Indiana brought medical child abuse allegations against the parents, leading to a four-day loss of custody. But an Indiana judge sided with the parents and found no probable cause for the removal, and the family was reunited.

A few days later, the same child welfare workers in Indiana allegedly coaxed the parents to take one of the children for a medical evaluation at Comer Hospital of the University of Chicago Medical Center. The parents agreed. But as the complaint tells it, the whole thing was a setup. The parents didn't know that the visit was a continuation of the child abuse investigation. Less than two weeks later, the parents lost custody yet again.

The parents responded by filing suit on behalf of themselves and their children (minors AA, BB, and CC). They sued the two Indiana child welfare officers, Samantha Ilic and Melissa Lara ("the State Defendants"). And they sued Comer Hospital and two of its employees, Dr. Veena Ramaiah and Lindsay Forrey ("the Hospital Defendants"). The twelve-count complaint

includes claims under the Fourth and Fourteenth Amendments, and a smattering of claims under Illinois law.

The State Defendants and the Hospital Defendants moved to dismiss the complaint. For the reasons stated below, the motion to dismiss by the State Defendants is denied. The motion to dismiss by the Hospital Defendants is granted.

## Background

Before diving into the allegations of the complaint, the Court offers a reminder about the applicable standard. At the motion to dismiss stage, the Court must accept as true the well-pleaded allegations of the complaint. *See Lett v. City of Chicago*, 946 F.3d 398, 399 (7th Cir. 2020). The Court "offer[s] no opinion on the ultimate merits because further development of the record may cast the facts in a light different from the complaint." *Savory v. Cannon*, 947 F.3d 409, 412 (7th Cir. 2020). That's always the rule, but given the sensitivities of the case, it is worth remembering.

The case involves the removal of children from the home of Kenneth and Deborah Dalla Costa. They have three children. During the time in question, AA was 11 years old, BB was 9 years old, and CC was 7 years old. *See* Am. Cplt., at ¶¶ 20–22 (Dckt. No. 26).

On September 16, 2019, the Indiana Department of Child Services ("DCS") received an anonymous call on a hotline about medical child abuse. *Id.* at ¶¶ 12, 30. The caller alleged that the Dalla Costas (who were residents of Indiana) were seeking unnecessary medical treatment for their children. *Id.*

Specifically, the anonymous caller said that he or she suspected Munchausen Syndrome by Proxy (also known as Factitious Disorder Imposed on Another). *Id.* Deborah Dalla Costa allegedly "was exaggerating or fabricating AA's medical symptoms" to get certain surgeries and

procedures done on the child. *Id.* The caller claimed that Deborah Dalla Costa "was shopping for doctors around the country for surgeries / procedures local doctors refused to perform." *Id.*

The identity of that caller remains a mystery. By that point, AA had received treatment at Comer Hospital at the University of Chicago Medical Center several times, including in 2012, 2015, 2016, 2018, and earlier in 2019. *Id.* at ¶¶ 43, 58. The complaint suggests that the treating physician, Dr. Uzelac, may have placed the anonymous call. *Id.* at ¶ 30. In fact, AA's medical charts say that Dr. Uzelac "made the report for medical child abuse." *Id.* But Dr. Uzelac later testified that she was not the caller. *Id.*

By all appearances, the Dalla Costas were all-too-familiar with issues about the treatment of children. At the time, Ken Dalla Costa was the Associate Director of Foster Care Clinical Services at UCAN, a subcontractor of the Illinois Department of Children and Family Services. *Id.* at ¶ 19. Deborah Dalla Costa is a licensed psychotherapist and a stay-at-home mom. *Id.*

The Indiana Department of Child Services opened an investigation of the Dalla Costas based on the anonymous call. Two case workers, Defendants Samantha Ilic and Melissa Lara, took the lead. *Id.* at ¶¶ 27–28. And they took swift action. Ilic and Lara (again, "the State Defendants") formalized the allegations of abuse by filing a petition in the Juvenile Division of Lake County, Indiana. *Id.* at ¶ 31.

The abuse allegations led to a temporary loss of custody. On September 19, 2019, while the case remained pending, the state of Indiana removed AA, BB, and CC from the care of their parents. *Id.*

The parents did not consent to the loss of custody. *Id.* No court order authorized the removal of the children. *Id.* No exigent circumstances justified the removal, either. *Id.*

Even so, the State removed the children "[b]ased on the recommendation" of Defendant Forrey of the University of Chicago Medical Center. *Id.* Forrey is a social worker, not a physician. *Id.* at ¶ 54. She is a member of the Child Advocacy and Protective Services team at Comer Hospital. *Id.* at ¶¶ 23–25, 31. Forrey had recommended "very limited parental contact while evaluations are being completed for cases like this . . . ." *Id.* at ¶ 31.

Forrey recommended removal of the children even though she had not spoken with the parents or the children. *Id.* at ¶ 32. Forrey had not reviewed the medical records, either. *Id.* Forrey based her recommendation on a review of Facebook posts, which raised issues similar to another case that involved medical child abuse. *Id.*

A state court judge presided over a hearing on September 23, 2019, meaning a few days after the removal of the children. *Id.* Ilic and Lara testified about the multiple diagnoses that the children had received, such as OCD, anxiety, and ADHD. *Id.* at ¶ 35. They also recommended that the children be placed in foster care until they could be evaluated at Comer Hospital, and until the parents could receive a psychological assessment. *Id.* at ¶ 36. They claimed that the parents were reporting "undocumented rare diseases," and were going around the country in search of surgeries and procedures. *Id.*

Ilic and Lara also testified about why they had removed the children. The state seized the children "due to their tender age, concerns for their immediate safety and well-being due to multiple doctors prescribing medications for the children and suspicions of factitious disorder imposed on other." *Id.* at ¶ 34.

The petition in state court didn't get very far. At the hearing on September 23, 2019, the Indiana judge entered a directed verdict on the petition in favor of the Dalla Costas based on "a lack of evidence/probable cause." *Id.* at ¶ 37.

That same day, the Dalla Costa children were returned to the custody of their parents. *Id.* at ¶ 31. So the parents lost custody of their children for four days, from September 19 to 23, 2019. *Id.*

By the sound of things, the State Defendants didn't take "no" for an answer. The same state workers "immediately went back to work on removing the children again." *Id.* at ¶ 3. According to the complaint, the State Defendants orchestrated a "set up" to remove the children a second time. *Id.* at ¶¶ 4, 20, 22.

Basically, the State Defendants cooked up a plan to have one of the children receive medical care at Comer Hospital. But the goal wasn't medical care. The true purpose was to continue a child abuse investigation, *sub silentio*. *Id.* at ¶¶ 44–45. They wanted a medical doctor's "diagnosis" to give them cover and "get them past the probable cause hearing." *Id.* at ¶ 3.

But first, the State Defendants needed to get the child from Indiana to Chicago. And that's when the State Defendants allegedly threatened more abuse charges.

A week after the Indiana court dismissed the case, the State Defendants told the Dalla Costas that they needed to take their older daughter (AA) to Comer Hospital in Chicago for a medical evaluation – or else. *Id.* at ¶¶ 4, 38. If they didn't comply, the state would refile the abuse charges, and "take AA, BB, and CC from the adult Plaintiffs." *Id.* at ¶ 38.

The parents acquiesced to the demand. On September 30, 2019, Ken Dalla Costa took AA to Comer Hospital at the University of Chicago Medical Center to avoid having the children removed for a second time. *Id.* According to the complaint, he agreed to do so under duress. *Id.* at ¶ 39.

But again, things didn't end there. The Dalla Costas allege that the hospital visit wasn't a run-of-the-mill medical evaluation. Instead, the would-be medical evaluation was a child abuse investigation, in disguise. *Id.* at ¶ 48. Defendants "disguise[d] the detention of AA and further investigation of Medical Child Abuse as an evaluation of AA's medicines and diagnoses." *Id.* at ¶ 45.

Before the examination, no one told the parents that the child was there for a child abuse investigation. *Id.* at ¶ 47. But AA's medical charts from the day reveal the real reason for the visit. The notations confirm that "AA was admitted to Comer for evaluation of medical child abuse." *Id.* at ¶ 48.

As the Dalla Costas tell it, "Ilic and Lara could not get the 'conviction' they wanted on their own. So, they enlisted a medical doctor willing to review the same records, look at the same facts, and reach the same conclusion Ilic and Lara reached previously, and which was rejected by the juvenile court." *Id.* at ¶ 50.

On October 3, 2019, Dr. Ramaiah offered her diagnosis. She concluded that Deborah Dalla Costa "had sought excessive medical care for AA; misled doctors about AA's prior diagnoses; and exaggerated AA's symptoms." *Id.* at ¶ 54.

The complaint at hand devotes more than 20 paragraphs to undermining the conclusions of Dr. Ramaiah. *Id.* at ¶¶ 54–77. For example, "[t]he conclusions are classic *ipse dixit*, or 'expert' in nature simply because an expert says so. There is nothing scientific about what [Dr.] Ramaiah did." *Id.* at ¶ 55. Basically, "Ilic and Lara intended on refiling abuse and neglect charges against Plaintiffs" all along, and they "used an MD as the mouthpiece for their own conclusions because Ilic and Lara knew the juvenile court would defer to and respect the conclusions of an MD." *Id.* at ¶¶ 45, 50.

As a result of the medical evaluation at Comer Hospital, the State Defendants brought a second round of charges in state court against the Dalla Costas for child abuse and neglect. *Id.* at ¶ 74. This time, the Indiana court found probable cause, based on the medical examinations at Comer Hospital. *Id.* at ¶ 6.

For the second time, the Dalla Costas lost custody of their children. *Id.* at ¶¶ 78–80. A few months later, the state court entered a directed verdict for the parents, and dismissed the case. *Id.*

But in the meantime, the parents lost custody of their children for about two months. *Id.* AA was removed from the family from September 30 to December 5, 2019. *Id.* at ¶¶ 78–79. BB and CC were removed from October 11 to December 5, 2019. *Id.* at ¶ 80.

The Dalla Costas responded by filing a complaint on behalf of themselves and their minor children. The complaint includes a dozen counts, including a number of constitutional claims as well as claims under state law.

The Dalla Costas brought five constitutional claims. Two counts allege unreasonable seizures by Ilic, Lara, and Forrey based on the removal of the children (Counts I and II). One count alleges an unreasonable search by Ilic, Lara, Forrey, and Ramaiah based on the medical evaluation of AA (Count III). Two counts allege violations of due process against Ilic, Lara, Forrey, and Ramaiah based on the child welfare investigation and the ensuing removal of the children (Counts IV and V). *Id.* at ¶¶ 99–124.

The Dalla Costas also brought claims under state law. Specifically, Plaintiffs brought counts against Comer Hospital for declaratory and injunctive relief (Counts VI and VII), and claims against Ramaiah, Forrey, and Comer Hospital for intentional infliction of emotional distress under Illinois law (Counts VIII, IX, and X). *Id.* at ¶¶ 125–49. Finally, they brought two

claims of false imprisonment under Illinois law against Ramaiah and Comer Hospital (Counts XI and XII). *Id.* at ¶¶ 150–58.

In response, Defendants moved to dismiss. (Dckt. Nos. 27, 28). The State Defendants filed a motion to dismiss, and so did the Hospital Defendants.

## Legal Standard

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not the merits of the case. *See* Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a motion to dismiss, the Court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the plaintiff's favor. *See AnchorBank, FSB v. Hofer*, 649 F.3d 610, 614 (7th Cir. 2011). To survive, the complaint must give the defendant fair notice of the basis for the claim, and it must be facially plausible. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## Analysis

The State Defendants and the Hospital Defendants filed separate motions to dismiss. The Court will address them one at a time.

### *The State Defendants*

The State Defendants move to dismiss on three grounds. First, they contend that this Court lacks personal jurisdiction. *See* State Defs.' Mem. in Support of Mtn. to Dismiss, at 4–7 (Dckt. No. 29). Second, they argue that the complaint fails to allege that they had personal

involvement in any constitutional deprivation. *Id.* at 7–9. And third, they assert qualified immunity. *Id.* at 9–15. The Court takes each argument in turn.

## I.     Lack of Personal Jurisdiction (the State Defendants)

The State Defendants begin with the argument that the Court lacks personal jurisdiction. They argue that they have no "continuous and systematic" contacts with Illinois, and they never purposely availed themselves of the forum. *See* State Defs.' Mem. in Support of Mtn. to Dismiss, at 6–7 (Dckt. No. 29).

The party asserting personal jurisdiction – here, the Dalla Costas – bears the burden of proof. *See Kipp v. Ski Enter. Corp. of Wisc., Inc.*, 783 F.3d 695, 697 (7th Cir. 2015). When considering a motion to dismiss for lack of personal jurisdiction, the Court must "read the complaint liberally, in its entirety, and with every inference drawn in" plaintiff's favor. *Central States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 878 (7th Cir. 2006) (citation omitted).

When the Court resolves a motion to dismiss for lack of personal jurisdiction based on the briefs, without an evidentiary hearing, the plaintiff "need only make out a *prima facie* case of personal jurisdiction."[1] *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (citation omitted); *see also Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir.

---

[1] Plaintiffs argue that personal jurisdiction over the State Defendants is apparent from the complaint. But they also (or maybe alternatively) request an evidentiary hearing to decide the matter. *See* Pls.' Resp. to State Defs.' Mtn. to Dismiss, at 7–8 (Dckt. No. 35). A district court must hold an evidentiary hearing when personal jurisdiction turns on material facts that the parties dispute. *See Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). Plaintiffs point to no material facts in dispute bearing on this Court's jurisdiction over the State Defendants. *See* Pls.' Resp. to State Defs.' Mtn. to Dismiss, at 7–8 (Dckt. No. 35). Additionally, the State Defendants agree that the facts are "undisputed." *See* State Defs.' Reply to State Defs.' Mtn. to Dismiss, at 7 (Dckt. No. 37). Accordingly, the Court declines to hold an evidentiary hearing. *See Urban 8 Danville Corp. v. Nationwide Affordable Housing Fund 4, LLC*, 2020 WL 3058101, at *2 n.4 (N.D. Ill. 2020) (declining to hold an evidentiary hearing at the party's request because there were no material factual disputes); *RSK Enters., LLC v. Comcast Spectator, L.P.*, 2018 WL 319318, at *5 (N.D. Ill. 2018) (same).

2002). The plaintiff "is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record." *Purdue Rsch. Found.*, 338 F.3d at 782; *see also Curry Revolution Lab'ys, LLC*, 949 F.3d 385, 393 (7th Cir. 2020). The tie goes to personal jurisdiction.

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014). Federal courts look to state law because their "authority to assert personal jurisdiction in most cases is linked to service of process on a defendant 'who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located.'" *Walden v. Fiore*, 571 U.S. 277, 283 (2014) (quoting Fed. R. Civ. P. 4(k)(1)(A)).

A federal court sitting in diversity in this district can exercise jurisdiction over a defendant "only if authorized both by Illinois law and by the United States Constitution." *be2 LLC v. Ivanov*, 642 F.3d 555, 558 (7th Cir. 2011); *see also Matlin v. Spin Master Corp.*, 921 F.3d 701, 705 (7th Cir. 2019). The Illinois long-arm statute authorizes courts to exercise personal jurisdiction over defendants who engage in a number of specifically enumerated acts, including the "transaction of any business within this State" and the "making or performance of any contract or promise substantially connected with this State." *See* 735 ILCS 5/2-209(a)(1), (7).

The Illinois long-arm statute also contains a catch-all provision that authorizes courts to "exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." *See* 735 ILCS 5/2-209(c). There is "no operative difference" between the federal and state Constitutions on the limits of personal jurisdiction. *See Mobile Anesthesiologists Chicago, LLC v. Anesthesia Assocs. of Houston Metroplex, P.A.*, 623 F.3d 440, 443 (7th Cir. 2010). The "Illinois long-arm statute permits the exercise of jurisdiction

to the full extent permitted by the Fourteenth Amendment's Due Process Clause . . . so here the state statutory and federal constitutional inquiries merge." *See Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010). The two-part analysis collapses into one – if personal jurisdiction passes constitutional muster, it complies with Illinois law, too.

To satisfy the Due Process Clause, a defendant must have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Millikin v. Meyer*, 311 U.S. 457, 463 (1940)). Minimum contacts exist where "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1984).

Personal jurisdiction comes in two forms: general and specific. *See Daimler,* 571 U.S. at 126–28; *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1034 (2021). A court has general jurisdiction over a defendant only if that defendant has continuous and systematic connections to the forum state. *See Daimler*, 571 U.S. at 127. General jurisdiction means that the defendant is so "at home" in the forum state that he or she can be sued there for anything, even a claim that has no nexus to the state at all. *See Goodyear Dunlop Tires Ops., S.A. v. Brown*, 564 U.S. 915, 919 (2011).

The State Defendants argue that the Dalla Costas have failed "to make a *prima facie* showing that this Court has general jurisdiction" over them. *See* State Defs.' Mem. in Support of Mtn. to Dismiss, at 6 (Dckt. No. 29). They admit "the amended complaint alleges that AA was admitted to Comer for a medical evaluation," but they maintain that nothing else shows "that

either State Defendant was ever involved in Illinois." *Id.* So, the State Defendants argue, they lack "continuous and systematic connections" to Illinois.

In response, the Dalla Costas counter that this Court has general jurisdiction because of "[t]he Indiana DCS's engagement of their [child abuse investigation] team in Illinois." *See* Pls.' Resp. to State Defs.' Mem. in Support of Mtn. to Dismiss, at 5 (Dckt. No. 35).

But "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there." *Daimler*, 571 U.S. at 137; *see also id.* at 136 (affirming *Goodyear*'s rejection of a "sprawling view of general jurisdiction") (internal citations and quotation marks omitted). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile." *Goodyear*, 564 U.S. at 924.

Sporadic interactions with a state do not render a defendant "at home" in that state. *See James v. Lydon*, 2020 WL 704795, at *1 (N.D. Ill. 2020) (finding no general personal jurisdiction because each of the defendants "resides and is domiciled in a state other than Illinois, and none of them has had, at any relevant time, more than a sporadic presence in this state"); *see also Johnson v. Melton Truck Lines, Inc.*, 2016 WL 8711494, at *3 (N.D. Ill. 2016) (concluding that "a few phone calls and emails" were insufficient for general personal jurisdiction); *Heritage Vintage Invs., LLC v. KMO Dev. Grp., Inc.*, 2015 WL 12838162, at *3 (N.D. Ill. 2015) (holding that even regularly conducted business and travel to Illinois was not enough for general personal jurisdiction).

Here, the State Defendants live and work in Indiana. *See* Am. Cplt., at ¶¶ 27–28 (Dckt. No. 26). And their alleged contacts with Illinois are far from continuous and systematic. The State Defendants may have contacted others in Illinois who also investigate child abuse, but those contacts are far from enough to give rise to general jurisdiction.

12

It is not enough that the Indiana Department of Child Services has longstanding ties to investigatory teams in Illinois. *See* Pls.' Resp. to State Defs.' Mem. in Support of Mtn. to Dismiss, at 5 (Dckt. No. 35) ("[t]he Indiana DCS's engagement of their [child abuse investigation] team in Illinois"). Personal jurisdiction is, well, *personal*. It depends on a defendant's personal ties to the forum state. The ties of someone else – including an employer – don't cut it.

The other possibility is specific jurisdiction. A court has specific jurisdiction "when the defendant purposefully directs its activities at the forum state and the alleged injury arises out of those activities." *Mobile Anesthesiologists Chicago*, 623 F.3d at 444; *see also Daimler*, 571 U.S. at 127. Specific jurisdiction "depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 564 U.S. at 919 (cleaned up). That is, the claim at issue must arise out of the defendant's ties to the forum state.

What's more, the relationship between the defendant and the forum "must arise out of contacts that the defendant *himself* creates with the forum." *Curry*, 949 F.3d at 396 (quoting *Walden*, 571 U.S. at 277) (cleaned up). A plaintiff must allege "injury *and* 'something more' directed at the state before jurisdiction over a foreign defendant may be considered proper." *Tamburo*, 601 F.3d at 706 (emphasis in original).

Finally, even if the defendant purposefully directed suit-related conduct at the forum state, the Court's exercise of specific personal jurisdiction must also comply with "traditional notions of fair play and substantial justice" under the Due Process Clause. *Tamburo*, 601 F.3d at 702; *see also Felland v. Clifton*, 682 F.3d 665, 673 (7th Cir. 2012).

The Dalla Costas argue that specific jurisdiction is proper because the State Defendants have an "ongoing relationship" with Illinois through their decision to seek "health care workers [in Illinois] to investigate medical child abuse." *See* Pls.' Resp. to State Defs.' Mem. in Support of Mtn. to Dismiss, at 6 (Dckt. No. 35). On the flipside, the State Defendants argue that the "alleged violations plainly do not arise out of, and are not connected to, any activities directed by State Defendants to Illinois." *See* State Defs.' Mem. in Support of Mtn. to Dismiss, at 7 (Dckt. No. 29).

On balance, the Dalla Costas have done enough to make a *prima facie* case that this Court has specific jurisdiction over the State Defendants. According to the complaint, the State Defendants affirmatively contacted Illinois-based medical staff to enlist their help in a specific child abuse investigation. *See* Am. Cplt., at ¶¶ 3, 44–45, 50 (Dckt. No. 26). That contact was targeted directly at the forum state – the State Defendants called individuals in Illinois to facilitate an evaluation and investigation in the forum state. And the State Defendants coaxed Ken Della Costa to take AA to Comer Hospital in Chicago, too. *Id.* at ¶¶ 38–39, 47.

By reaching out to someone in Illinois, the State Defendants "should have reasonably anticipated being haled into court in Illinois." *Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr.*, 536 F.3d 757, 764 (7th Cir. 2008); *see also Rogers v. City of Hobart*, 996 F.3d 812, 820 (7th Cir. 2021) (finding no specific jurisdiction where defendant "did not undertake any affirmative action in Illinois, or any action purposefully designed to have an effect within Illinois"). The State Defendants allegedly communicated with co-defendants in Illinois, and coaxed the Dalla Costas to travel to Illinois.

Moreover, the State Defendants' contact with individuals in Illinois led to the alleged injuries suffered by the Dalla Costas. The complaint alleges that the State Defendants'

correspondence with the Hospital Defendants directly resulted in various constitutional deprivations and state law violations. *See* Am. Cplt., at ¶¶ 103–05, 109, 111, 116 (Dckt. No. 26).

It does not matter that the State Defendants have not set foot in Illinois. Correspondence by phone, mail, and email can be enough for specific jurisdiction where the defendant targets their conduct toward the forum state. *See Romans v. Orange Pelican, LLC*, 2022 WL 16856420, at *5–6 (N.D. Ill. 2022) (finding specific jurisdiction through correspondence even though the defendant had never physically entered the state); *Citadel*, 536 F.3d at 764; *Heritage House Rests., Inc. v. Cont'l Funding Grp., Inc.*, 906 F.2d 276, 283 (7th Cir. 1990); *Triad Cap. Mgmt., LLC v. Priv. Equity Cap. Corp.*, 2008 WL 4104357, at *5 (N.D. Ill. 2008).

The exercise of specific personal jurisdiction would not offend notions of fair play and substantial justice, either. A district court must consider "'the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of [the underlying dispute], and the shared interest of the several States in furthering fundamental substantive social policies.'" *Purdue Rsch. Found.*, 338 F.3d at 781 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

Litigating in Illinois will pose a minimal burden on the State Defendants, who reside in Indiana – not far from the federal courthouse in Chicago. Additionally, Illinois has an interest in the litigation. The child welfare medical investigation was conducted here. Three Defendants are Illinois residents. And the Dalla Costas themselves now reside in the state. *See* Am. Cplt., at ¶ 18 (Dckt. No. 26). If anything, litigating in Illinois is the best available alternative.

## II.     Personal Involvement in Constitutional Violations (the State Defendants)

Next, the State Defendants (again, Samantha Ilic and Melissa Lara) argue that the complaint fails to allege that they were personally involved in any constitutional deprivation. *See* State Defs.' Mem. in Support of Mtn. to Dismiss, at 7–9 (Dckt. No. 29).

Specifically, they contend that the complaint fails to allege that "the kids were removed by State Defendants," so they ask the Court to dismiss Counts I and II (about unreasonable seizures). *Id.* at 8–9. They also argue that the complaint fails to allege that they had any personal involvement in the alleged search of AA at Comer Hospital. *Id.* at 7–8. So they ask the Court to dismiss Count III (about an unreasonable search).

"Lawsuits against individuals require personal involvement in the constitutional deprivation to support a viable claim." *See Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003). "Without evidence of personal involvement, the named individual defendants cannot be liable under § 1983." *See Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017).

To establish liability under section 1983, "the plaintiff must show that the relevant official 'caused the constitutional deprivation at issue' or 'acquiesced in some demonstrable way in the alleged constitutional violation.'" *Gonzalez v. McHenry County*, 40 F.4th 824, 828 (7th Cir. 2022) (quoting *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003)). Put another way, a plaintiff must allege that the individual defendant "'caused or participated in a constitutional deprivation.'" *Craddock v. Pfister*, 2022 WL 1499808, at *4 (N.D. Ill. 2022) (quoting *Pepper v. Village of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005)).

At this early stage, Plaintiffs have done enough to plausibly allege that Ilic and Lara caused the constitutional deprivations at issue, or at least participated in those constitutional

16

deprivations. They are not bit players in the drama – if anything, they are near the center of the stage.

Consider the first removal of the children. The complaint alleges that the State Defendants spearheaded the effort to remove the children from the home. Ilic and Lara led the investigation and prepared the petition in Indiana state court. *See* Am. Cplt., at ¶ 31 (Dckt. No. 26).

That filing led to the removal of the children. In fact, "Ilic and Lara seized the children on September 19, 2019." *Id.* at ¶ 34. The complaint alleges that the seizure of the children was unlawful. They acted without a court order, consent, or exigent circumstances. *Id.* at ¶¶ 31, 101. They removed the children after receiving the recommendation from Forrey. *Id.* at ¶ 32. And then, they provided "false" representations to the Indiana court during the hearing on September 23, 2019. *Id.* at ¶ 37.

The complaint alleges that Ilic and Lara poured the foundation and laid the groundwork for the unlawful removal of the children from the home. That's enough to establish personal involvement.

For the second removal, Ilic and Lara played an even heavier role. The complaint includes many paragraphs alleging that Ilic and Lara tried to gin up a medical basis for removing the children.

The Dalla Costas claim that "Ilic and Lara arranged for Forrey and Ramaiah to investigate suspected medical child abuse at Comer in Illinois." *Id.* at ¶ 29. Ilic and Lara "threatened that if Ken did not bring AA to Comer for review of her medications and diagnoses, then they would immediately refile charges of abuse and neglect and take AA, BB, and CC from the adult Plaintiffs." *Id.* at ¶ 38.

17

The complaint alleges that Ilic and Lara coaxed the Dalla Costas to take AA to Comer Hospital based on "false pretenses." *Id.* at ¶ 49. The true purpose was not a medical evaluation. "That was a setup, and it was based on a lie." *Id.* at ¶ 4. The real goal was to continue a child abuse investigation.

The complaint alleges that Ilic and Lara used a doctor as "the shill they needed to mislead the juvenile court." *Id.* at ¶ 3. "Ilic and Lara could not get the 'conviction' they wanted on their own. So, they enlisted a medical doctor willing to review the same records, look at the same facts, and reach the same conclusion Ilic and Lara reached previously, and which was rejected by the juvenile court. The difference this time being that Ilic and Lara used an MD as the mouthpiece for their own conclusions." *Id.* at ¶ 50.

The end goal was the removal of the children from the home. And in the meantime, AA endured a search of her person. "AA's person was searched by various employees at Comer at the direction of [Dr.] Ramaiah between September 30, 2019, and October 11, 2019." *Id.* at ¶ 114; *see also id.* at ¶ 5.

True, the complaint does not allege that Ilic and Lara personally searched AA. But the complaint does allege that the search took place as part of a plan that they personally hatched.

Ilic and Lara ultimately filed a second petition in Indiana state court, based on the "predetermined conclusion" of Dr. Ramaiah. *Id.* at ¶ 75. "Ilic and Lara's use of [Dr.] Ramaiah was concerted and intended to deceive the juvenile court." *Id.* at ¶ 77; *see also id.* ("Ilic and Lara constructed with Ramaiah a fool proof way to deceive the juvenile court and to avenge the prior embarrassment Ilic and Lara suffered when Judge Stefaniak threw their case out of court.").

According to the complaint, the scheme worked. The state court ultimately removed the children "based on *inter alia* the false statements and testimony of Ilic, Lara, and Ramaiah." *Id.* at ¶ 80.

In sum, these accusations "allow[] the court to draw the reasonable inference" that the State Defendants played a meaningful role in the alleged Fourth Amendment violations suffered by the Dalla Costas. *See Iqbal*, 556 U.S. at 678. Accordingly, the Court denies the motion to dismiss based on a failure to show personal involvement.

## III. Qualified Immunity (the State Defendants)

Finally, the State Defendants moved to dismiss based on qualified immunity. *See* State Defs.' Mem. in Support of Mtn. to Dismiss, at 9 (Dckt. No. 29).

Qualified immunity protects government officials when they exercise discretionary functions. *See Roldan v. Stroud*, 52 F.4th 335, 337 (7th Cir. 2022) (citing *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)). Qualified immunity is a "doctrine designed to protect public officials from the effects of guessing wrong in a world of legal uncertainty." *See Anderson v. Cornejo*, 355 F.3d 1021, 1022 (7th Cir. 2004).

State officials "are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was 'clearly established at the time.'" *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)).

Defendants often receive qualified immunity in child-removal cases, given the exercise of judgment calls and the sensitive balancing of the interests. "A parent has a right to familial relations, but that right is qualified by the State's interest in protecting children. The balance between these interests is 'nebulous at best,' so most defendants in child-removal cases are

19

entitled to qualified immunity." *See Royal v. Payne*, 2022 WL 4008718, at *2 (7th Cir. 2022) (citation omitted); *see also Brokaw v. Mercer County*, 235 F.3d 1000, 1023 (7th Cir. 2000) (agreeing with other Circuits that it is "generally the case" that "social workers and other state actors who cause a child's removal are entitled to qualified immunity because the alleged constitutional violation will rarely – if ever – be clearly established," given that "the balance between a child's liberty interest in familial relations and a state's interest in protecting the child is nebulous at best").

The timing, however, is another story. Qualified immunity offers protection from liability, *and* from suit. "The qualified immunity doctrine provides defendants immunity from suit, not just a defense to liability." *See Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (explaining that qualified immunity is an "entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essential legal [immunity] question").

Protecting a defendant from the burden of defending a case is one of the core purposes of qualified immunity. The Supreme Court has "made clear that the 'driving force' behind the creation of the qualified immunity doctrine was a desire to ensure that 'insubstantial claims' against government officials [will] be resolved prior to discovery." *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (cleaned up; brackets in original).

"Because qualified immunity is 'an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial.'" *Id.* (citation omitted). So the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible state in litigation." *Id.* at 232; *see also Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

But practically speaking, qualified immunity on a motion to dismiss is a rare occurrence. "Rarely do we see qualified immunity at the pleading stage. The reason is because determinations of qualified immunity most often depend on facts a plaintiff is not required to plead at the outset of litigation to avoid dismissal." *Roldan*, 52 F.4th at 337; *see also Hanson v. LeVan*, 967 F.3d 584, 589 (7th Cir. 2020). A complaint only needs to include a "short and plain statement" showing a plausible claim, *see* Fed. R. Civ. P. 8(a)(2), but the defense of qualified immunity "often depends on the particular facts of a given case." *Roldan*, 52 F.4th at 339 (cleaned up).

In that sense, there is a tug of war between ordinary pleading standards and the purposes of qualified immunity. There is tension between plaintiff-friendly pleading standards and defendant-friendly qualified immunity. *See Jacobs v. City of Chicago*, 215 F.3d 758, 765 n.3 (7th Cir. 2000) ("On one hand, courts have been admonished that qualified immunity is the ability to be free from suit, not merely a defense from liability, and that, therefore, the question of immunity should be decided at the earliest possible stage. . . . On the other hand, the notice pleading requirements of Rule 8 do not require that a plaintiff anticipate the assertion of qualified immunity by the defendant and plead allegations that will defeat that immunity. The Supreme Court has recognized the tension in this area but has declined to address this issue.") (citations omitted); *Hanson v. LeVan*, 967 F.3d 584, 590 n.2 (7th Cir. 2020) ("We have recognized the tension between the plausibility standard that applies to motions for dismissal of a complaint; the often fact-intensive nature of qualified-immunity determinations; and the protection that the qualified-immunity doctrine provides against the burdens of pretrial matters, including discovery."); *Reed v. Palmer*, 906 F.3d 540, 548 (7th Cir. 2018) ("The plausibility standard creates tension at this stage of litigation between developing the requisite facts for a well-

21

informed qualified immunity determination and preserving a government official's right to avoid the burdens of pretrial matters, including discovery. . . . [T]his tension generally makes Rule 12(b)(6) a poor fit for dismissal on the basis of qualified immunity."). The rules tug in different directions.

Qualified immunity is a burden-flipping affirmative defense. "Qualified immunity is an affirmative defense, but once the defendant raises it, 'the burden shifts to the plaintiff to defeat it.'" *Taylor v. City of Milford*, 10 F.4th 800, 806 (7th Cir. 2021); *Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017) ("Though it is an affirmative defense for pleading purposes, the plaintiff carries the burden of showing that defendants are not immune."); *Abbott v. Sangamon County*, 705 F.3d 706, 723 (7th Cir. 2013) ("Once a defendant raises the defense of qualified immunity, the plaintiff bears the burden of defeating it.").

Then again, a plaintiff does not have to plead around affirmative defenses in a complaint, including qualified immunity. *See Crawford-El v. Britton*, 523 U.S. 574, 595 (1998); *Gomez v. Toledo*, 446 U.S. 635, 640 (1980); *Milchtein v. Milwaukee County*, 42 F.4th 814, 822 (7th Cir. 2022) ("A complaint need not anticipate affirmative defenses . . . ."). The Supreme Court has "consistently declined . . . to revise established rules that are separate from the qualified immunity defense." *See Crawford-El*, 523 U.S. at 595. And in particular, the Supreme Court has "refused to change the Federal Rules governing pleading by requiring the plaintiff to anticipate the immunity defense . . . ." *Id.*

That is, when a defendant asserts qualified immunity, the plaintiff has the burden to demonstrate that qualified immunity does *not* apply. At the motion-to-dismiss stage, the complaint is all that matters. So, in effect, the Court looks to the allegations in the complaint to

decide whether the complaint passes muster and overcomes the defendant's assertion of qualified immunity. But a complaint doesn't have to plead around an affirmative defense, either.

There lies the tension. A plaintiff has the burden of overcoming an assertion of qualified immunity. But at the motion-to-dismiss stage, a complaint doesn't have to defeat an affirmative defense.[2] So, a plaintiff has the burden to overcome a defense that the complaint has no obligation to plead around.

To be sure, courts sometimes do dismiss a complaint on qualified immunity grounds. *See, e.g., Doe v. Purdue Univ.*, 928 F.3d 652, 665 (7th Cir. 2019) (Barrett, J.) ("There is no hard-and-fast rule, however, against resolving qualified immunity on the pleadings."). Most of the time, the reason for dismissal is the lack of a clearly established constitutional right. *See Jacobs*, 215 F.3d at 765 n.3 ("[A] complaint may be dismissed under Rule 12(b)(6) on qualified immunity grounds where the plaintiff asserts the violation of a broad constitutional right that had not been articulated at the time the violation is alleged to have occurred."); *Doe*, 928 F.3d at 665 ("That said, the existence of qualified immunity is not always dependent on factual development – it is sometimes clear on the face of the complaint that the constitutional right invoked was not clearly articulated in the case law."). "Ultimately, dismissal under Rule 12(b)(6) is appropriate based on qualified immunity only when the plaintiffs' well-pleaded allegations, taken as true, do not 'state a claim of violation of clearly established law.'" *See Hanson v. LeVan*, 967 F.3d 584, 590 (7th Cir. 2020) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 306 (1996)).

If the question turns on the facts, the issue of qualified immunity is best left for a later day. *See Jacobs*, 215 F.3d at 765 n.3 ("[I]n many cases, the existence of qualified immunity will

---

[2] Maybe the idea is that a complaint can plead itself out of court. And, if a complaint shows that there *is* qualified immunity, then the complaint must leave the building. But that's true in every case. A complaint can always plead itself out of court by showing that an affirmative defense has merit. That's true for affirmative defenses that *aren't* burden-flipping, like the statute of limitations.

depend on the particular facts of a given case. In those cases, the plaintiff is not required initially to plead factual allegations that anticipate and overcome a defense of qualified immunity."); *see also id.* at 775 ("Rule 12(b)(6) is a mismatch for immunity and almost always a bad ground of dismissal.") (Easterbrook, J., concurring); *Hanson*, 967 F.3d at 589 ("Nor is it [*i.e.*, dismissal under Rule 12(b)(6)] always (if ever) the most suitable procedural setting to determine whether an official is qualifiedly immune, because immunity may depend on particular facts that a plaintiff need not plead to state a claim."); *Reed*, 906 F.3d at 548 ("Because a qualified immunity defense so closely depends 'on the facts of the case,' a 'complaint is generally not dismissed under Rule 12(b)(6) on qualified immunity grounds.'") (citation omitted). In the tug-of-war between plaintiff-friendly pleading standards and defendant-friendly qualified immunity, ordinary pleading standards have the upper hand.

Putting those principles together, qualified immunity protects certain defendants from suit, and from liability. It offers two-ply protection. But sometimes the parties have to litigate for a while before a court can determine whether defendants have protection from getting sued in the first place. Defendants sometimes have to run part of the race before hearing whether they had to run the race at all.

At the end of the day, qualified immunity is rarely a reason for dismissal at the motion to dismiss stage, unless the complaint shows itself the door. When a defendant raises qualified immunity in a motion to dismiss, "it is the defendant's conduct *as alleged in the complaint* that is scrutinized for 'objective legal reasonableness.'" *See Reed*, 906 F.3d at 549 (emphasis in original; citation omitted).

With those standards in mind, the Court turns to whether the complaint passes muster in light of the defense of qualified immunity. Again, the State Defendants are "entitled to dismissal

24

unless (1) the plaintiffs adequately alleged facts that, if true, would constitute a violation of a statutory or constitutional right, and (2) the right was 'clearly established' at the time of the alleged violation, such that a reasonable public official would have known his conduct was unlawful." *See Hanson*, 967 F.3d at 592.

At this point, the facts in the case are too muddled to grant the State Defendants qualified immunity. On a motion to dismiss, this Court must rely on the allegations of the complaint. And here, the complaint alleges that the State Defendants committed constitutional violations, and alleges that the rights were clearly established. At the very least, the facts are too up in the air and up for grabs to support a finding of qualified immunity at this early stage.

At the end of the day, the assertion of qualified immunity might carry the day. When the facts come to light in discovery, the case might look different. For now, the complaint is what matters. And here, the complaint does enough to overcome an assertion of qualified immunity.

### A. Violation of a Federal or Constitutional Right

The first question is whether the complaint adequately alleges a violation of a federal or constitutional right. *See* State Defs.' Mem. in Support of Mtn. to Dismiss, at 9–14 (Dckt. No. 29). The State Defendants argue that the complaint does not allege a Fourth Amendment seizure, and does not allege a violation of the Fourteenth Amendment. *Id.*

The Court begins with the Fourth Amendment seizure claims (Counts I and II). As a reminder, the Dalla Costas allege that the State Defendants violated the Fourth Amendment by twice removing the children from their home without a court order, probable cause, exigency, or consent. *See* Am. Cplt., at ¶¶ 1, 101, 108 (Dckt. No. 26).

Generally speaking, "[a] 'seizure' within the meaning of the Fourth Amendment occurs when a person's 'freedom of movement is restrained' either 'by means of physical force or show

25

of authority.'" *Carter v. City of Milwaukee*, 743 F.3d 540, 543 (7th Cir. 2014) (quoting *United States v. Mendenhall*, 446 U.S. 544, 552 (1980)). More specifically "in the context of removing a child from his home and family, a seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances, meaning that state officers have reason to believe that life or limb is in immediate jeopardy." *Xiong v. Wagner*, 700 F.3d 282, 289–90 (7th Cir. 2012) (cleaned up).

The Fourth Amendment applies to an "unreasonable" seizure, so the standard is whether the state officials acted with probable cause. *See Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 474–75 (7th Cir. 2011). "The probable cause inquiry is an objective one, focused on the facts known to defendants at the time the removal decision was made and upon whether a 'prudent caseworker (meaning one of reasonable caution) could have believed that [the child] faced an immediate threat of abuse based on those facts.'" *Xiong*, 700 F.3d at 290 (quoting *Brokaw*, 235 F.3d at 1010).[3]

When it comes to qualified immunity, the question is not whether there was, in fact, probable cause for the removal of a child. The question is whether a reasonable case worker could have *believed* that there was probable cause. *Id.* ("We need not determine whether probable cause in fact existed at the time of [defendant's] removal decision. Rather, we may rule on qualified immunity grounds that a reasonable caseworker *could have believed* that probable cause existed and accordingly wouldn't have understood his actions to violate a constitutional right. Thus, as long as [state] workers 'could have believed [the child's removal] to be lawful, in

---

[3] The standard under the Fourth Amendment for the removal of a child (*i.e.*, a seizure) is probable cause. *See Xiong*, 700 F.3d at 290. The standard under the Fourteenth Amendment for the separation of a family is reasonable suspicion. *See Brokaw*, 235 F.3d at 1019; *Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017).

light of clearly established law and the information they possessed,' defendants are entitled to qualified immunity.") (emphasis in original) (cleaned up); *see also Siliven v. Indiana Dept. of Child Servs.*, 635 F.3d 921, 927 (7th Cir. 2011) ("Our focus is on the facts and circumstances known to defendants at the time they decided to remove C.S., and whether a prudent caseworker (meaning one of reasonable caution) could have believed that C.S. faced an immediate threat of abuse based on those facts."); *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (holding that officers "are entitled to immunity if a reasonable officer could have believed that probable cause existed").

Here, the complaint alleges that the State Defendants removed the Dalla Costa children from their custody – twice. *See* Am. Cplt., at ¶¶ 2, 5, 31, 101, 103, 108, 111, 113 (Dckt. No. 26). That's a seizure. The removal of a child from a home is a seizure within the meaning of the Fourth Amendment. *See Jerger v. Blaize*, 41 F.4th 910, 914 (7th Cir. 2022); *Xiong*, 700 F.3d at 289.

The State Defendants argue that there was no seizure. But in reality, they seem to be arguing that the complaint does not allege an *unreasonable* seizure. Even so, the complaint alleges that the State Defendants removed the children without a court order, probable cause, exigency, or consent. *See* Am. Cplt., at ¶¶ 2, 5, 31, 101, 103, 108, 111, 113 (Dckt. No. 26). And the complaint includes enough facts to paint a picture and call into question the reason for the removal.

The State Defendants argue that they had probable cause to remove the children. As they see it, they had probable cause for the first removal based on the anonymous report of abuse. *See* State Defs.' Mem. in Support of Mtn. to Dismiss, at 12 (Dckt. No. 29).

27

Maybe that argument will carry the day someday. But not today. At this point, the Court knows relatively little about the substance of the anonymous phone call. The complaint describes the call, but only in broad strokes. *See* Am. Cplt., at ¶ 26 (Dckt. No. 26) (describing the anonymous call). Based on the allegations, the Court cannot conclude at this juncture that the complaint fails to allege a constitutional violation.

A similar conclusion applies to the recommendation of Forrey from Comer Children's Hospital. Before the first removal, she made a recommendation to Ilic and Lara. Specifically, she recommended "very limited parental contact while evaluations are being completed for cases like this." *Id.* at ¶ 31. She also believed that the Facebook posts needed to be investigated because they were similar to another case involving medical child abuse. *Id.* at ¶ 32.

Again, at this juncture, the details are hazy. Maybe Forrey said something that would give rise to probable cause for the removal – or maybe not. The allegations lack the granularity and nuances that the Court would need before declaring that there was no constitutional violation. To put a finer point on it: the Court cannot conclude, at this early stage, that the complaint does *not* allege a constitutional violation.

The same conclusion applies to the paragraph of the complaint that describes the reasons for the first removal. Ilic and Lara "seized the children on September 19, 2019, 'due to their tender age, concerns for their immediate safety and well-being due to multiple doctors prescribing medications for the children and suspicions of factitious disorder imposed on other.'" *Id.* at ¶ 34.

Details would help, but details are lacking. It is not even clear what, exactly, the complaint is quoting (presumably the allegations made in state court, but it is hard to say).

28

The complaint also alleges that, before the first removal, the State Defendants never spoke to any of the Dalla Costas and didn't review any of the children's medical records. *Id.* at ¶ 32. And remember, too, that the first welfare charges were dismissed "for a lack of evidence/probable cause." *Id.* at ¶ 37. At this stage, the Court must assume that the allegations of the complaint are true, and must draw all reasonable inferences in Plaintiffs' favor. *See Lett*, 946 F.3d at 399.

The same conclusion applies to the second removal of the children. AA was removed from the custody of her parents on September 30, 2019, when she arrived at Comer Hospital. *See* Am. Cplt., at ¶ 78 (Dckt. No. 26). The complaint alleges that there was no probable cause for her removal.

In fact, nothing had changed between the date of the first hearing in state court (on September 23) and the day of her arrival at Comer Hospital (on September 30). *Id.* at ¶¶ 37, 78. Nothing had changed, that is, except that Ilic and Lara allegedly concocted a scheme to remove the children without a legitimate basis for doing so. *Id.* at ¶¶ 3, 45, 50. At this stage, that's enough to allege a constitutional violation.

The same goes for the removal of the other children. They were removed from the home on October 11, 2019, "based on *inter alia* the false statements and testimony of Ilic, Lara, and Ramaiah." *Id.* at ¶ 80. Once again, the complaint alleges that there was no legitimate basis to remove the children. *Id.* at ¶ 1. For now, that allegation is enough to allege a constitutional violation.[4] *See* State Defs.' Mem. in Support of Mtn. to Dismiss, at 12 (Dckt. No. 29).

---

[4] In arguing that there was no constitutional violation, the State Defendants seem to suggest only that Counts I and II should be dismissed because there was no seizure. *See* State Defs.' Mem. in Support of Mtn. to Dismiss, at 9 (Dckt. No. 29). But part of their argument involves whether the medical evaluation – *i.e.*, the search – of AA was proper. *Id.* at 10–11. Specifically, they contend that the Dalla Costas' agreement to have a medical evaluation of AA was "a voluntary action" and not some "elaborate sinister plan against them." *Id.* at 10. According to the State Defendants, "Ken voluntarily took AA to Comer for

The complaint also alleges enough information about the search of AA during the medical examination. The complaint includes oblique references to what happened to AA when she arrived at Comer Hospital on September 30, 2019. *See* Am. Cplt., at ¶ 1 (referring to the "unreasonable search of one of the minor Plaintiffs"); *id.* at ¶ 5 ("AA was searched"); *id.* at ¶ 7 (referring to the "unreasonable search of AA"); *id.* at ¶ 114 ("AA's person was searched by various employees at Comer at the direction of Ramaiah"); *but see id.* at ¶ 55 ("[Dr.] Ramaiah did not examine AA"). Maybe AA was subjected to a medical examination of some kind. Once again, the details are lacking, and the details are too sketchy to say that qualified immunity exists.

The next question is whether the complaint alleges a Fourteenth Amendment violation. Once again, the State Defendants argue that the complaint does not allege a constitutional violation, so they should receive qualified immunity on Count IV. *See* State Defs.' Mem. in Support of Mtn. to Dismiss, at 13–14 (Dckt. No. 29).

---

a medications and treatment evaluation." *Id.* So, they maintain that the Dalla Costas "cannot allege 'coercion,' 'threatened,' 'conspiracy(ed),' 'setup,' nor 'duress' against Defendants because the decision to take AA to Comer was optional, and Defendants are permitted to enforce repercussions, like removal, for failing to agree to the evaluation given their suspicions of child abuse." *Id.* at 11. Whether the medical evaluation was constitutional implicates the unreasonable search claim (Count III), not the unreasonable seizure claims (Counts I and II). *See* Am. Cplt., at ¶¶ 113–17 (Dckt. No. 26). But in any event, the Dalla Costas have done enough to plausibly allege they are entitled to relief for the unreasonable search claim (Count III). The State Defendants may be right that child welfare employees can threaten to enforce their legal rights (*e.g.*, child welfare proceedings which may lead to a lawful order for removal) to entice some action (*e.g.*, a voluntary medical exam) by parents suspected of abuse. *See Dupuy v. Samuels*, 465 F.3d 757, 761 (7th Cir. 2006). But under Seventh Circuit case law, lawful threats can only go so far. "[S]ome threats used to obtain compliance with a child welfare investigation violate clearly established constitutional rights." *Jerger v. Blaize*, 41 F.4th 910, 915 (7th Cir. 2022). That includes threats to unlawfully remove children from their home without a court order, probable cause, or exigency. *Id.* Here, the Dalla Costas allege that the State Defendants threatened to remove the children – unlawfully and without justification – if they failed to complete the medical evaluation. *See* Am. Cplt., at ¶ 38 (Dckt. No. 26). That threat would have turned any "voluntariness" in the medical evaluation into improper coercion. So the allegations are enough to survive a motion to dismiss.

The Supreme Court has held that the Fourteenth Amendment guarantees the right of parents to "establish a home and bring up children." *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). To lawfully interfere with that right as part of a child welfare investigation, case workers must have "some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017) (internal quotation marks omitted).

Once again, the same conclusion applies. The complaint adequately alleges that the state lacked a legitimate basis to remove the children. Based on the facts as a whole, the complaint adequately describes a potential violation of the Fourteenth Amendment.

All in all, the case is too new – and the record is too undeveloped – to conclude that the State Defendants did not commit a constitutional violation. The complaint alleges enough to overcome the hurdles of qualified immunity (for now, anyway).

## B. Clearly Established Rights

The next question is whether the complaint alleges a violation of a clearly established right. Once again, the Court concludes that the complaint does enough to get over that hurdle.

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Plaintiffs have the burden to defeat qualified immunity "either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, not-withstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott v. Sangamon County*, 705 F.3d 706, 723–24 (7th Cir. 2013).

To satisfy the standard, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Clearly established law "must be 'particularized' to the facts of the case." *White v. Pauly*, 580 U.S. 73, 79 (2017). That is, the "dispositive question is 'whether the violative nature of *particular* conduct is clearly established.'" *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (emphasis in original).

The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Al-Kidd*, 563 U.S. at 742; *see also Weiland v. Loomis*, 938 F.3d 917, 919 (7th Cir. 2019) ("Over and over, the Supreme Court has held that a right is 'clearly established' only if it has been 'defined with specificity.'") (citation omitted); *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (noting that the "clearly established" standard requires a "high 'degree of specificity'") (citation omitted).

The "undebatable right must be defined with particularity." *See Garcia v. Posewitz*, 2023 WL 5354822, at *4 (7th Cir. 2023). For example, the "right to be free of excessive force" is too general in a case about an arrest. *See City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019).

In sum, the standard for qualified immunity "sounds like a high bar because it is – qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *See Lopez v. Sheriff of Cook County*, 993 F.3d 981, 988 (7th Cir. 2021).

The State Defendants maintain that there is no case law that would have led "a reasonable caseworker to believe a violation exists by removing children after their parent is accused of medical child abuse," or by "report[ing] abuse when they suspect medical child abuse." *See* State Defs.' Mem. in Support of Mtn. to Dismiss, at 15 (Dckt. No. 29). In response, the Dalla Costas contend in general terms that "there are clearly established rules prohibiting Fourth

Amendment and due process violations in this context." *See* Pls.' Resp. to State Defs.' Mtn. to Dismiss, at 15 (Dckt. No. 35).

Once again, the Court concludes that the facts are too sketchy about what, exactly, happened. It is difficult to say whether the conduct violated clearly established rights without knowing what took place. The Seventh Circuit has recognized clearly established boundaries in this context. But it hard to say whether anyone crossed bright lines when there is uncertainty about the underlying facts.

For starters, consider the claims about removing the children. Well-established case law requires the government to have a basis for removing children from a home. More than two decades ago, the Seventh Circuit held that no reasonable person would believe they could "use the government's power to cause, or to conspire to cause, the unjustified removal of a . . . child from his parents." *Brokaw v. Mercer County*, 235 F.3d 1000, 1022 (7th Cir. 2000); *see also Morris v. Dearborne*, 181 F.3d 657, 668 (5th Cir. 1999) ("It is beyond purview that any rational teacher could believe that governmental destruction of a family based on fabricated evidence is constitutionally allowed."); *Malik v. Arapahoe County Dep't of Soc. Servs.*, 191 F.3d 1306, 1316 (10th Cir. 1999) ("[I]t is clearly established law that government officials' procurement through distortion, misrepresentation and omission of a court order to seize a child is a violation of the Fourth Amendment.").

Since then, courts in this district have toed the line. *See, e.g.*, *Churnovic v. Walker*, 2021 WL 1379486, at *6 (N.D. Ill. 2021) (denying qualified immunity because "there was no evidence giving rise to a reasonable suspicion the Plaintiffs abused Baby C, but DCFS nevertheless targeted them as child abusers"); *Hernandez v. Foster*, 2009 WL 1952777, at *7 (N.D. Ill. 2009)

(denying qualified immunity based on allegations that state employees removed child from home without evidence of abuse).

But as things stand, this Court does not have anything to go on, except the complaint. And the complaint does not offer enough details to be able to definitively declare whether the conduct violated clearly established rights. For now, the complaint alleges enough to survive for another day.

The complaint alleges that Ilic and Lara removed the children "based on a lie." *See* Am. Cplt., at ¶ 4 (Dckt. No. 26). The complaint also alleges that, for the second removal, Ilic and Lara used the testimony of Dr. Ramaiah "to mislead the juvenile court." *Id.* at ¶ 3; *see also id.* at ¶ 77 (alleging that they "intended to deceive the juvenile court"). Worse yet, the complaint alleges that the "representations Ilic and Lara made to the juvenile court were false." *Id.* at ¶ 37. The complaint refers to the "false statements and testimony of Ilic, Lara, and Ramaiah." *Id.* at ¶¶ 79, 80; *see also id.* at ¶ 95 (referring on the rule against "knowingly false statements of child neglect").

The state cannot remove children from a home based on false pretenses, knowing that they are acting on false information. *See Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 474–75 (7th Cir. 2011) ("Due process 'requires that government officials not misrepresent the facts in order to obtain the removal of a child from his parents.'") (quoting *Brokaw*, 235 F.3d at 1020)). The state cannot lie to a court to obtain an order of removal. *See Brokaw*, 235 F.3d at 1022. So, at this juncture, the complaint has alleged enough to overcome the hurdles of the Federal Rules when it comes to qualified immunity.

The same is true of the Fourth Amendment claim about inducing the parents to take AA to Comer Hospital. Seventh Circuit precedent "is clear that some threats used to obtain

compliance with a child welfare investigation violate clearly established constitutional rights." *Jerger v. Blaize*, 41 F.4th 910, 915 (7th Cir. 2022).

Accepting the complaint's version of events as true, the State Defendants threatened to file additional child abuse charges and "take AA, BB, and CC from" them if they refused to submit AA to the medical evaluation at Comer Hospital. *See* Am. Cplt. at ¶ 38 (Dckt. No. 26). And according to the complaint, the whole thing was a ruse – the State Defendants told the parents that they needed to take AA for a medical evaluation, but the true purpose was a child abuse investigation. *Id.* at ¶¶ 38–46. Depending on what happened, a reasonable case worker could have known that the threats crossed the line. *See Jerger*, 41 F.4th at 915.

The Seventh Circuit has recognized limits on child welfare investigations, too. "[U]nreasonable child-abuse investigations can violate the right to familial relations." *See Sebesta v. Davis*, 878 F.3d 226, 234 (7th Cir. 2017). Case workers must "consider exculpatory evidence." *Id.* at 235; *see also Dupuy v. Samuels*, 397 F.3d 493, 505–06 (7th Cir. 2005). "[A]lthough child welfare caseworkers may investigate allegations of child abuse without violating parents' constitutional right to familial relations, they may not do so arbitrarily." *See Doe v. Heck*, 327 F.3d 492, 520 (7th Cir. 2003).

Many of these principles hover at a high level of generality – maybe too high for purposes of qualified immunity. They appear to be general standards rather than clear-cut, context-specific rules. If the ban on excessive force is too general, *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019), then the ban on unreasonable investigations is too general, too.

Even so, the Court does not need to pin down the right level of generality at this point. The facts are in flux, so it is hard to say whether the facts violated clearly established constitutional rules.

Once the facts are in, the record might show that the State Defendants are, in fact, entitled to qualified immunity. Again, defendants in child-removal cases usually receive qualified immunity. *See Royal v. Payne*, 2022 WL 4008718, at *2 (7th Cir. 2022). But not always. Time will tell.

In sum, the motion to dismiss filed by the State Defendants is denied.

***The Hospital Defendants***

The Court will now turn to the motion to dismiss filed by the two Hospital Defendants, Forrey and Dr. Ramaiah. Again, Forrey was a social worker at Comer Children's Hospital. *See* Am. Cplt., at ¶¶ 24, 54 (Dckt. No. 26). Again, Dr. Ramaiah is a physician, and is a member of the Child Advocacy and Protective Services team at Comer Children's Hospital. *Id.* at ¶¶ 23, 54.

The Hospital Defendants offer four reasons for dismissal. First, they argue that the complaint fails to state a claim under section 1983. *See* Hospital Defs.' Mtn. to Dismiss, at 6–8 (Dckt. No. 27). Second, they argue that, in any event, they are entitled to qualified immunity. *Id.* at 10–11. Third, they contend that as mandated reporters under Illinois law, they are immune from any state law claims stemming from their report of child abuse. *Id.* at 11–13. Fourth, they argue that the complaint fails to state a claim for intentional infliction of emotional distress, false imprisonment, and injunctive and declaratory relief. *Id.* at 14–15.

## IV. Failure to State a Claim under Section 1983 (the Hospital Defendants)

The Hospital Defendants begin by arguing that the complaint fails to plausibly allege a claim under section 1983. A complaint must allege two things to state a claim: "(1) the deprivation of a right secured by the Constitution or federal law and (2) that defendants were acting under the color of state law." *Wilson v. Warren County*, 830 F.3d 464, 468 (7th Cir. 2016).

The Hospital Defendants argue that the complaint fails both prongs. First, they contend that the complaint has not plausibly alleged that they were state actors. Second, they argue that the complaint has not plausibly alleged a deprivation of a constitutional or federal right.

### A.    State Action

The Hospital Defendants first argue that the complaint fails to state a claim because Defendants Forrey and Ramaiah did not act under color of state law. They contend that they are private actors, not state actors. *See* Hospital Defs.' Mtn. to Dismiss, at 6–8 (Dckt. No. 27).

Section 1983 includes a state-action requirement. That is, a defendant must have acted under color of state law. "To state a claim for relief in an action brought under § 1983, respondents must establish . . . that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999). "The under-color-of-state-law element means that § 1983 does not permit suits based on private conduct, 'no matter how discriminatory or wrongful.'" *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019) (citation omitted).

But that requirement does not necessarily mean that private actors are beyond the reach of the statute. "A private entity can qualify as a state actor in a few limited circumstances – including, for example, (i) when the private entity performs a traditional, exclusive public function; (ii) when the government compels the private entity to take a particular action; or (iii) when the government acts jointly with the private entity." *See Manhattan Comm. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019) (citations omitted). "At its most basic level, the state action doctrine requires that a court find such a 'close nexus between the State and the challenged action' that the challenged action 'may be fairly treated as that of the State itself.'"

*See Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 823–24 (7th Cir. 2009) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)).

The question here is whether the complaint satisfies the last exception – concerted action. Specifically, "a private citizen can act under color of law if there is evidence of a *concerted effort* between a state actor and that individual." *Spiegel v. McClintic*, 916 F.3d 611, 616 (7th Cir. 2019) (emphasis in original) (quotation marks omitted); *see also L.P. v. Marian Catholic High Sch.*, 852 F.3d 690, 696 (7th Cir. 2017) ("A private person acts under color of state law when she is a willful participant in joint action with the State or its agents.") (internal quotation omitted)).

To show state action through concerted effort, a plaintiff must allege that "(1) a state official and private individual(s) reached an understanding to deprive the plaintiff of his constitutional rights, and (2) those individual(s) were willful participant[s] in joint activity with the State or its agents." *Spiegel*, 916 F.3d at 616 (quotation marks omitted). In other words, a plaintiff "must establish that a conspiracy, or an understanding, to violate the plaintiff's constitutional rights existed between the public and private actors." *See Stagman v. Ryan*, 176 F.3d 986, 1003 (7th Cir. 1999).

"A requirement of the joint action charge . . . is that both public and private actors share a common, unconstitutional goal." *Cunningham v. Southlake Ctr. for Mental Health, Inc.*, 924 F.2d 106, 107 (7th Cir. 1991); *see also Tarkowski v. Robert Bartlett Realty Co.*, 644 F.2d 1204, 1206 (7th Cir. 1980) ("It is not sufficient to allege that the (private and state) defendants merely acted in concert or with a common goal. There must be allegations that the defendants had directed themselves toward an unconstitutional action by virtue of a mutual understanding."). "For a private actor to act under color of state law he must have 'had a "meeting of the minds" and thus reached an understanding' with a state actor to deny plaintiffs a constitutional right."

*See Wilson v. Warren County*, 830 F.3d 464, 468 (7th Cir. 2016) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158 (1970)).

But "mere allegations of joint action or a conspiracy do not demonstrate that the defendants acted under color of state law and are not sufficient to survive a motion to dismiss." *Spiegel*, 916 F.3d at 616. "This requires evidence of a concerted effort between a state actor and that individual." *L.P. v. Marian Catholic High Sch.*, 852 F.3d 690, 696 (7th Cir. 2017) (cleaned up). Circumstantial evidence can support an inference of a conspiracy, but speculation cannot. *See Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003).

The Hospital Defendants argue that nothing in the complaint alleges that Forrey or Ramaiah had an agreement with the State Defendants to deprive the Dalla Costas of any constitutional right. *See* Hospital Defs.' Mtn. to Dismiss, at 8 (Dckt. No. 27). They contend that the complaint shows only that they communicated with, and provided recommendations and opinions to, the State Defendants, which isn't enough for section 1983 liability. *Id.*

The Court agrees. The complaint does allege that there is a relationship between the state of Indiana and Comer Children's Hospital. The Child Advocacy and Protective Services team at Comer Hospital "performs administrative and investigatory functions on behalf of certain state agencies, including IN DCS, in cases of suspected child abuse or neglect." *See* Am. Cplt., at ¶ 26 (Dckt. No. 26). The state of Indiana "refers case[s] to the CAPS team at Comer," and Comer "contracts with, and is compensated by, IL DCFS to *inter alia* investigate suspected cases of abuse and neglect." *Id.* at ¶ 29.

The complaint alleges that the state of Indiana and Comer Hospital worked together. But a relationship between a government and a private institution, without more, is not enough to convert the private actor into a state actor.

The question is whether the complaint alleges an agreement to commit a constitutional violation. And here, the complaint falls far short of alleging a joint activity and concerted effort to violate constitutional rights. The complaint does not plausibly allege that they worked together in a concerted way to commit constitutional violations. The allegations are too thin to give rise to a plausible inference of a conspiracy.

Consider, for example, the allegations against Defendant Forrey, the social worker. The complaint alleges that Forrey communicated with the state of Indiana before the first removal of the children. Forrey recommended "very limited parental contact" while the state of Indiana investigated potential abuse. *See* Am. Cplt., at ¶ 31; *see also id.* at ¶ 102 (alleging that Forrey recommended removal of the children). Forrey also shared her view that the family's Facebook posts created a genuine need for investigation. *Id.* at ¶ 32. And then, based in part on Forrey's recommendations, the children were removed from the home. *Id.* at ¶ 31.

Those allegations do not come close to alleging a conspiracy to violate constitutional rights. At most, the complaint alleges that Forrey weighed in on how the state of Indiana should handle a situation involving potential child abuse. Expressing an opinion is not the same thing as joining and promoting a conspiracy.

More generally, the complaint alleges that Ilic and Lara (again, the case workers with the state of Indiana) arranged for Forrey and Ramaiah to investigate suspected medical child abuse at Comer Hospital. *Id.* at ¶ 29. But an investigation into potential child abuse, without more, is not a constitutional violation. The complaint does not allege that Forrey and Ramaiah conspired with the state of Indiana to take the children away for improper reasons. (Conclusory allegations don't count.)

The complaint does include quite a few paragraphs critiquing the opinions of Dr. Ramaiah. *See, e.g., id.* at ¶¶ 54–77. The complaint poked a number of holes, and pointed to a number of perceived cracks in her evaluation. *Id.*

But the complaint stops short of alleging that Dr. Ramaiah reached those opinions as a result of concerted efforts with the state of Indiana. There is no allegation, for example, that anyone from the state of Indiana told the doctor what to say, or what conclusion to reach. There are no allegations of an agreement to reach phony conclusions for improper reasons.

To be sure, the complaint alleges that the conclusion of child abuse was "predetermined." *See id.* at ¶¶ 6, 54, 55, 74, 75. But conclusory allegations are not enough to get over the pleading hurdles. Saying that the conclusion was "predetermined" isn't any better than simply alleging that there was a conspiracy, which isn't enough. *See Spiegel*, 916 F.3d at 616.

Calling Dr. Ramaiah a "shill" and a "mouthpiece" is not enough to allege a conspiracy, either. *See* Am. Cplt., at ¶¶ 3, 50 (Dckt. No. 26). Stating a claim requires facts, not name-calling.

In a related context, the Seventh Circuit has "repeatedly held that 'the mere act of furnishing information to law enforcement officers' does not constitute joint activity." *See Spiegel*, 916 F.3d at 617; *see also Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009) (affirming the dismissal of a complaint when the alleged conspiracy involving reporting a person to the child welfare agency); *Holderman v. Walker*, 2021 WL 1192441, at *14 (N.D. Ill. 2021) ("At most, the factual allegations specific to each medical professional suggest that they either threatened to report the Parents to DCFS, did report the Parents, or played a role in reporting the Parents. But these actions, standing alone, are not enough to allege joint action or conspiracy between the medical professionals, who are mandatory reporters, and DCFS.").

The case at hand involves a situation in a similar vein. At bottom, the complaint alleges that Forrey and Dr. Ramaiah contributed information – recommendations and opinions – that led to the removal of the children. That allegation, without more, is not enough to give rise to a plausible inference of a conspiracy.

Overall, the complaint does not do enough to allege coordinated efforts to deprive Plaintiffs of their constitutional rights. The complaint does allege that the state of Indiana used the services of Comer Children's Hospital. But the complaint does not contain enough facts to give rise to a reasonable inference that the state of Indiana engaged in a concerted effort and conspired with Forrey and Dr. Ramaiah to remove the children for wrongful reasons.

### B. Deprivation of a Constitutional or Federal Right

Next, the Hospital Defendants argue that the complaint fails to allege constitutional violations by Forrey or Dr. Ramaiah. The lack of state action is enough to sink the constitutional claims against the Hospital Defendants. But the Court will consider the other argument for sake of completeness.

The claims against Forrey include (1) a Fourth Amendment claim about an unreasonable seizure for the first removal of the children (Count I); and (2) a Fourteenth Amendment claim about due process for a failure to investigate before the second removal of the children (Count IV).

The claims against Dr. Ramaiah include (1) a Fourth Amendment claim about an unreasonable seizure for the second removal of the children (Count II); (2) a Fourth Amendment claim about an unreasonable search of AA at Comer Hospital (Count III); (3) a Fourteenth Amendment claim about due process for a failure to investigate before the second removal of the

children (Count IV); and (4) a Fourteenth Amendment claim about due process for making a recommendation before the second removal of the children (Count V).

As a refresher, a search or seizure passes muster under the Fourth Amendment only "if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent circumstances, meaning that state officers have reason to believe that life or limb is in immediate jeopardy." *Xiong v. Wagner*, 700 F.3d 282, 289–90 (7th Cir. 2012)

Under the Fourteenth Amendment, parents have a right to "establish a home and bring up children." *See Meyer v. Nebraska*, 262 U.S. 390, 399 (1923). The "right to familial relations" protects against the "forced separation" of parents and children. *See Brokaw v. Mercer County*, 235 F.3d 1000, 1018 & n.14 (7th Cir. 2000).

But "parental interests in familial integrity must be weighed against the state's interest in protecting children from harm." *See Sebesta v. Davis*, 878 F.3d 226, 233 (7th Cir. 2017). The right to family integrity is "limited by the compelling governmental interest in the protection of children particularly where the children need to be protected from their own parents." *See Brokaw*, 235 F.3d at 1019.

To lawfully interfere with parental rights, child welfare workers must have "some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Id.* (quotation marks omitted). The "reasonable suspicion" standard is an objective one. *Id.*; *see also Terry v. Richardson*, 346 F.3d 781, 787 (7th Cir. 2003).

To establish liability under section 1983, "the plaintiff must show that the relevant official 'caused the constitutional deprivation at issue' or 'acquiesced in some demonstrable way in the alleged constitutional violation.'" *Gonzalez v. McHenry County*, 40 F.4th 824, 828 (7th

Cir. 2022) (quoting *Palmer v. Marion County*, 327 F.3d 588, 594 (7th Cir. 2003)). Put another way, a plaintiff must allege that the individual defendant "'caused or participated in a constitutional deprivation.'" *Craddock v. Pfister*, 2022 WL 1499808, at *4 (N.D. Ill. 2022) (quoting *Pepper v. Village of Oak Park*, 430 F.3d 805, 810 (7th Cir. 2005)).

The Court will address the claims against Forrey (the social worker), and then the claims against Dr. Ramaiah (the physician).

### 1. Forrey

Viewed in a light favorable to Plaintiffs, the complaint does not sufficiently allege that Forrey violated a constitutional right. At bottom, the allegations against Forrey are relatively thin.

Before the first removal of the children, Forrey recommended that the parents have limited contact with the parents during the investigation. *See* Am. Cplt., at ¶ 31 (Dckt. No. 26). And based on that recommendation, the state of Indiana removed the children from the home on September 19, 2019. *Id.*; *see also id.* at ¶ 102. Forrey also recommended more investigation based on her review of Facebook posts. *Id.* at ¶ 32.[5]

There isn't much there. Forrey recommended separating children from their parents during a child abuse investigation. And Forrey opined that the situation resembled another child abuse case on her docket. That's not much of a basis to allege a constitutional violation.

---

[5] Any claim against Forrey about the first removal might have a statute of limitations problem, too (depending on when the claim accrued). The first removal took place on September 19, 2019. The statute of limitations is two years. *See Lewis v. City of Chicago*, 914 F.3d 472, 478 (7th Cir. 2019) ("A § 1983 claim borrows the statute of limitations for analogous personal-injury claims in the forum state; in Illinois that period is two years. 735 Ill. Comp. Stat. 5/13-202."); *Liberty v. City of Chicago*, 860 F.3d 1017, 1019 (7th Cir. 2017) ("The appropriate statute of limitations for § 1983 cases filed in Illinois is two years, as set forth in Illinois' personal injury statute.") (citation omitted); *Savory v. Cannon*, 947 F.3d 409, 414 (7th Cir. 2020). Plaintiffs filed the complaint on September 29, 2021, more than two years after the first removal of the children on September 19, 2019.

The complaint does not allege that Forrey made any false statements that led the state of Indiana to remove the children. *See Brokaw*, 235 F.3d at 1012 (concluding that a complaint stated a claim when the case workers "knew the allegations of child neglect were false, or withheld material information, and nonetheless caused or conspired to cause child's removal"); *Oleszczak ex rel. C.O. v. Illinois Dep't of Children and Family Servs.*, 2018 WL 3428102, at *6 (N.D. Ill. 2018) (denying a motion to dismiss when the state official "fed false information" to the people she interviewed, and "fabricate[d] evidence" in connection with a child removal); *Hatch v. Indiana Dep't of Child Servs.*, 2017 WL 4760607, at *2 (N.D. Ind. 2017) (denying a motion to dismiss when the complaint "allege[d] that the Defendants made factual misrepresentations in order to unfairly portray him as a drug addict"); *Young v. Sproat*, 2016 WL 659657, at *3-4 (C.D. Ill. 2016) (denying a motion to dismiss where the plaintiff alleged that the defendants deprived her of her parental rights "based on knowingly false information").

And the complaint does not allege facts that give rise to a plausible inference that Forrey bears responsibility for the removal of the children on September 19, 2019, either. *See Andersen v. Village of Glenview*, 2018 WL 6192171, at *12 (N.D. Ill. 2018) ("The problem with Andersen's argument, however, is that the complaint fails to allege facts that give rise to a plausible inference that Popkov bears responsibility for the court's entry of an order granting temporary custody of the children to Gimbel. The complaint alleges only that the State's Attorney requested the mental health evaluation and temporary loss of custody; as for Popkov's involvement, it states only, on information and belief, that the State's Attorney was acting on derogatory information she obtained from Popkov, Gimbel, and Kharasch."). A generic allegation that Forrey was the "moving force" is conclusory, so it counts for nothing. *See* Am. Cplt., at ¶ 102 (Dckt. No. 26).

At bottom, Forrey recommended additional investigation. True, "unreasonable child-abuse investigations can violate the right to familial relations." *See Sebesta*, 878 F.3d at 234. But at the end of the day, the complaint alleges little else besides the fact that Forrey contributed to the investigation. And the right to family integrity "does not include the right to be free from child abuse investigations." *See Thomas v. Starks*, 159 F. App'x. 716, 717 (7th Cir. 2005); *see also Doe v. Heck*, 327 F.3d 492, 520 (7th Cir. 2003).

The allegations of the complaint against Forrey are even thinner when it comes to the second removal of the children. The complaint blames "Defendants" for a failure to investigate, which led to the second removal of the children from October 11 to December 5, 2019. *See* Am. Cplt., at ¶ 119 (Dckt. No. 26).

The allegations about Forrey's involvement in the second removal are hazy and vague – if they exist at all. There is barely any mention of any role played by Forrey in the second removal. At best, the complaint alleges in conclusory fashion that "Defendants" were "continuing the investigation of the parents for medical child abuse through at least September 30, 2019." *Id.* at ¶ 105. It also alleges that Forrey's team was working on a "plan of care" for AA. *Id.* at ¶¶ 41–42.

They also assign fault to Forrey for the second removal because she managed the team at Comer Hospital. *Id.* at ¶ 41. But none of the allegations make clear how, exactly, Forrey played a role in the second removal of the children.

At best, the complaint assigns fault to Forrey for the second removal because she worked with Dr. Ramaiah and others at Comer Hospital. But a claim under section 1983 requires personal involvement in a constitutional violation. And here, there is none.

46

2.    **Dr. Ramaiah**

Next, the Court turns to the allegations against Dr. Ramaiah.  Once again, the allegations of the complaint are too thin and too sketchy.

Again, the complaint includes four claims against Dr. Ramaiah.  One count is a Fourth Amendment claim about the search of AA at Comer Hospital.  *See* Am. Cplt. (Count III).  The other three counts are Fourth Amendment and Fourteenth Amendment claims about the second removal of the children (Counts II, IV, & V).

The Fourth Amendment claim about the search of AA does not pass muster.  The complaint does not allege that Dr. Ramaiah personally searched AA.  In fact, it alleges the opposite.  *See* Am. Cplt., at ¶ 55 (Dckt. No. 26) (alleging that "[Dr.] Ramaiah did not examine AA").  The complaint does allege that "AA's person was searched by various employees at Comer at the direction of Ramaiah."  *Id.* at ¶ 114.

But the allegation is conclusory.  The complaint includes no facts to suggest that the search was unreasonable, or that Dr. Ramaiah was responsible for it.  Maybe there is more to the story, but there is not more to the complaint.

The other three counts are about Dr. Ramaiah's role in the second removal of the children.  Dr. Ramaiah reviewed the medical records and concluded that AA was experiencing medical child abuse.  *Id.* at ¶ 54.  Dr. Ramaiah communicated that conclusion to Ilic and Lara (the State Defendants), who then went back to Indiana state court with new charges.  *Id.* at ¶ 75.

Dr. Ramaiah "concluded formally on October 3, 2019, that Debi [Dalla Costa] had sought excessive medical care for AA; misled doctors about AA's prior diagnoses; and exaggerated AA's symptoms."  *Id.* at ¶ 54.  "Ramaiah's 'diagnosis' of medical child abuse in this case was reached based in part on her summary of AA's medical records dating back to 2012."  *Id.* at ¶ 57;

*see also id.* at ¶ 54 (alleging that Dr. Ramaiah's "conclusions were based on her review of the same medical records in her possession or accessible to her . . . prior to the filing and dismissal of the allegations of medical child abuse in the juvenile court").

The complaint then spends more than 20 paragraphs poking holes and taking shots at Dr. Ramaiah's conclusion. *Id.* at ¶¶ 54–77. As Plaintiffs see it, Dr. Ramaiah's diagnosis was "subjective," "predetermined," "misleading," and "rushed." *Id.* at ¶¶ 6, 55–56, 69, 74. In fact, the notion that a person can make a "diagnosis" of "medical child abuse" is a "fallacy." *Id.* at ¶ 7; *see also id.* at ¶ 56 ("Indeed, medical child abuse is not a 'diagnosis' in the traditional sense or common usage of that term.").

Plaintiffs take issue with how Dr. Ramaiah reached her conclusion. She did not examine AA, or talk with AA or the Dalla Costas about her medical history. *Id.* at ¶¶ 55, 73. She did not run any diagnostic tests. *Id.* "The conclusions are classic *ipse dixit*, or 'expert' in nature simply because an expert says so. There is nothing scientific about what Ramaiah did." *Id.* ¶ 55; *see also id.* at ¶ 76 (alleging that Dr. Ramaiah made a "legal conclusion").

The complaint challenges Dr. Ramaiah's expertise, too. She is "not a vascular surgeon," and "is not a gastroenterologist." *Id.* at ¶¶ 65, 68. She is not an "expert" in any of the diseases. *Id.* at ¶ 66. And so on.

Basically, Plaintiffs strongly disagree with the conclusions of Dr. Ramaiah. Even so, the complaint falls short of alleging a constitutional violation. At bottom, the complaint alleges that Dr. Ramaiah reviewed the records and reached a conclusion – the *wrong* conclusion.

The complaint does not allege that Dr. Ramaiah did not genuinely believe what she was saying. The complaint does not allege that she made any knowingly false statements, or agreed

to help remove the children for phony reasons. For the sake of argument, maybe Dr. Ramaiah reached the wrong conclusion. But making a mistake is not a constitutional violation.

By way of analogy, a medical provider in prison does not commit a constitutional violation by committing medical malpractice. *See Brown v. Osmundson*, 38 F.4th 545, 550 (7th Cir. 2022). A similar principle applies here. Even if Dr. Ramaiah was wrong, making a mistake is not enough to give rise to a claim. The Constitution does not forbid mistakes.

Overall, the complaint reads like a *Daubert* motion. Plaintiffs take aim at the medical authority on the other side, poking holes at the analysis and undermining her qualifications. But the Constitution does not require a state to rely on an expert opinion that survives the rigors of *Daubert* before taking action to remove children.

True, the complaint does include a few scattered references to an intent to deceive the juvenile court. *See* Am. Cplt., at ¶¶ 77, 79, 80. And the complaint refers to the "false statements and testimony of Ilic, Lara, and Ramaiah." *Id.* at ¶¶ 79, 80.

But once again, that allegation is conclusory. The complaint does not identify any false statements that Dr. Ramaiah made to the Indiana juvenile court.

Saying that testimony is inaccurate or mistaken is not the same thing as saying that testimony is false. False testimony, after all, is a crime. If Dr. Ramaiah gave false testimony to the Indiana court, then the complaint should reveal what she said. But the complaint does not reveal what she said, let alone explain why it was false.

Again, making a mistake does not cut it. All of us make mistakes, but most of them aren't constitutional violations. At the end of the day, the complaint falls short because it does not allege that Dr. Ramaiah knowingly made a false statement to the court.

49

Read in context, the complaint seems to allege that Ilic and Lara wanted to remove the children a second time, and used Dr. Ramaiah as their "shill" and "mouthpiece" for "their own conclusions."  *Id.* at ¶¶ 3, 50.  Ilic and Lara were driving the train, and Dr. Ramaiah was along for the ride.  The complaint does not include any concrete facts that could give rise to a plausible inference that Dr. Ramaiah agreed to make false statements to remove the children without any legitimate basis.

In sum, the complaint alleges that Dr. Ramaiah got it wrong, but that's about it.  The Constitution does not forbid mistakes, even in an important context of a child removal proceeding.  So there is no claim.

## V.      Qualified Immunity (the Hospital Defendants)

The claims against Forrey and Dr. Ramaiah would fail for an independent reason. Even if the complaint alleged state action, and even if the complaint alleged a constitutional violation, it would not make a difference.  The complaint does not allege a violation of a clearly established constitutional right.

The complaint basically alleges that Forrey gave her views before the first removal of the children.  And Dr. Ramaiah offered a diagnosis of medical child abuse before the second removal.  The complaint offers no reason to think that expressing views or making a diagnosis violated a clearly established constitutional right.

At best, the complaint alleges that the conclusion of Dr. Ramaiah was "predetermined." *See* Am. Cplt., at ¶¶ 6, 54, 55, 74, 75 (Dckt. No. 26).  That adjective is unadorned with surrounding facts.  To state a claim, a complaint must offer enough facts to tell a story that holds together.  *See Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).  And here, there is

no story to be heard.  A complaint does not satisfy the Federal Rules with soundbites and catch-phrases.

## VI.   Failure to State a Claim for Intentional Infliction of Emotional Distress, False Imprisonment, and Injunctive and Declaratory Relief (the Hospital Defendants)

Finally, the Hospital Defendants move to dismiss the intentional infliction of emotional distress claims (Counts VIII, IX, and X), false imprisonment claims (Counts XI and XII), and claims for declaratory and injunctive relief (Counts VI and VII) for failure to state a claim.  *See* Hospital Defs.' Mtn. to Dismiss, at 14–15 (Dckt. No. 27).

### A.   Intentional Infliction of Emotional Distress

The Court concludes that the complaint falls short of stating a claim of intentional infliction of emotional distress, even when read in Plaintiffs' favor.

To state a claim for intentional infliction of emotional distress under Illinois law, a plaintiff must allege that "(1) the defendant's conduct was truly extreme and outrageous; (2) the defendant intended to inflict severe emotional distress (or knew that there was at least a high probability that its conduct would cause severe emotional distress); and (3) the defendant's conduct did in fact cause severe emotional distress."  *Richards v. U.S. Steel*, 869 F.3d 557, 566 (7th Cir. 2017) (citing *Feltmeier v. Feltmeier*, 798 N.E.2d 75, 80 (Ill. 2003)).

Again, the complaint alleges that Forrey recommended the separation of the children from the parents during the initial investigation.  *See* Am. Cplt., at ¶ 31 (Dckt. No. 26); *see also id.* at ¶ 102.  And Forrey opined that the Facebook posts were consistent with medical child abuse.  *Id.* at ¶ 32.  Nothing about those allegations supports a plausible inference of extreme and outrageous conduct, let alone an intent to inflict severe emotional distress.

The same is true of the allegations against Dr. Ramaiah.  The complaint alleges that she made a wrong-headed conclusion about medical child abuse.  "Ramaiah concluded formally on

51

October 3, 2019, that Debi had sought excessive medical care for AA; misled doctors about AA's prior diagnoses; and exaggerated AA's symptoms." *Id.* at ¶ 54. The complaint pokes holes at her conclusion, at length. "There is nothing scientific about what Ramaiah did." *Id.* at ¶ 55.

True, falsely accusing a person of child abuse is undoubtedly serious and could constitute "extreme and outrageous" conduct. *See Day v. Buckham*, 2021 WL 5050288, at *4 (N.D. Ill. 2021) (concluding that allegations of false accusations of sexual child abuse adequately pled extreme and outrageous conduct); *Andersen v. Village of Glenview*, 2018 WL 6192171, at *21 (N.D. Ill. 2018) (denying a motion to dismiss an IIED claim where plaintiff alleged that the defendant "engaged in a campaign to have her falsely arrested and prosecuted so that she would lose custody over her children"); *B.F.G. v. Blackmon*, 2008 WL 4155263, at *5 (N.D. Ill. 2008) ("Assuming the truth of plaintiffs' amended complaint, for purposes of this motion, Casady charged B.F.G. for sexual misconduct even though DCFS's investigation yielded no credible evidence, she presented false testimony, she hid key physical evidence, and she lied to the court about it. These allegations state a plausible claim for IIED.").

Even so, the mere act of opining about potential child abuse is not enough to give rise to a claim of intentional infliction of emotional distress. The complaint needs to come forward with facts supporting the plausible inference that Defendants knew that the allegation was false. And here, they didn't. Maybe the opinion was mistaken or misguided, but an incorrect opinion is not enough to give rise to a plausible inference of an intent to inflict emotional distress.

The Court dismisses the intentional infliction of emotional distress claims against the Hospital Defendants. *See* Am. Cplt. (Dckt. No. 26) (Counts VIII, IX, & X).

### B.     False Imprisonment

The Court turns next to the false imprisonment claims. The complaint alleges that Dr. Ramaiah and Comer Hospital falsely imprisoned AA during her medical examination because she was unable to freely leave, and because Defendants had no lawful basis to keep her there. *See* Am. Cplt., at ¶¶ 150–58 (Dckt. No. 26).

To state a claim for false imprisonment under Illinois law, a plaintiff must allege that "(1) her personal freedom was curtailed against her wishes and (2) her detention was unreasonable or unlawful." *Irvin v. S. Illinois Healthcare*, 128 N.E.3d 1149, 1158 (Ill. App. Ct. 2019).

False imprisonment does not need to involve physical force. A person can falsely restrain another through "other duress" or "asserted legal authority." *Johnson v. City of Harvey*, 1998 WL 381702, at *11 (N.D. Ill. 1998) (citing *Lopez v. Winchell's Donut House*, 466 N.E.2d 1309, 1312 (Ill. App. Ct. 1984)); *see also Marcus v. Liebman*, 375 N.E.2d 486, 488 (Ill. App. Ct. 1978) (noting that false imprisonment "may be effected by words alone, by acts alone, or both" and that "[a]ctual force is unnecessary to an action in false imprisonment").

The parents claim that they took AA to Comer for a medical evaluation out of coercion. The complaint alleges that the Dalla Costas had to submit AA to the medical examination, or else the State Defendants would file abuse charges against them and remove the children from their home. *See* Am. Cplt., at ¶¶ 38–39 (Dckt. No. 26).

That allegation cannot give rise to a claim against Dr. Ramaiah. There is no allegation in the complaint that Dr. Ramaiah knew about any alleged coercion.

The complaint also does not allege that Dr. Ramaiah prevented AA from leaving the hospital. For that matter, the complaint does not allege that Comer Hospital prevented her from

leaving, either. The complaint says that "AA was not allowed to leave Comer without Defendants' permission." *Id.* at ¶ 152; *see also id.* at ¶ 5 (alleging that AA "was detained," without specifying who detained her). But the complaint does not allege that Dr. Ramaiah played a role and prevented her from going home. The facts are lacking, so the story is untold.

The Court dismisses false imprisonment claim against Dr. Ramaiah and Comer Hospital. *See* Am. Cplt. (Dckt. No. 26) (Counts XI & XII).

### C. Injunctive and Declaratory Relief Claims

The last remaining claims seek injunctive and declaratory relief against Comer Hospital. *See* Am. Cplt. (Dckt. No. 26) (Counts VI & VII). Comer Hospital argues that the claims make "unprecedented and alarming request[s] that ha[ve] absolutely no grounding in law." *See* Hospital Defs.' Mtn. to Dismiss, at 15 (Dckt. No. 27).

There is a bigger issue. An injunction and a declaratory judgment are forms of relief. They are remedies. They are not claims. Injunctive relief "is a remedy, not a cause of action, and thus should not be pleaded as a separate count." *Knutson v. Village of Lakemoor*, 932 F.3d 572, 576 n.4 (7th Cir. 2019); *see also Garrard v. Rust-Oleum Corp.*, 575 F. Supp. 3d 995, 1004 (N.D. Ill. 2021) (dismissing a count for declaratory relief because a "claim for a declaratory judgment is not a cognizable independent cause of action"); *Sieving v. Cont'l Cas. Co.*, 535 F. Supp. 3d 762, 774 (N.D. Ill. 2021) ("[R]equests for declaratory judgment and injunctions are not independent causes of action.") (quotation marks omitted); *Keesler v. Electrolux Home Prods., Inc.*, 2016 WL 3940114, at *3 (N.D. Ill. 2016) ("[T]he federal Declaratory Judgment Act (28 U.S.C. § 2201) provides only a form of relief, not an independent claim for relief.").

The Court dismisses the counts for injunctive and declaratory relief against Comer Hospital (Counts VI and VII).[6]

### Conclusion

For the reasons above, the Court denies the motion to dismiss by the State Defendants, and grants the motion to dismiss by the Hospital Defendants.

Date:   August 29, 2023

Steven C. Seeger
United States District Judge

---

[6]  In light of the dismissal of all state law claims, there is no need to reach the argument about state law immunity as mandatory reporters.