**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KENNETH DALLA COSTA and DEBORAH DALLA COSTA, individually and as the parents and next friends of AA, BB, and CC, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 21-cv-5165 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| VEENA RAMAIAH, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

The Indiana Department of Child Services received an anonymous letter sounding the alarm about the health and welfare of three young girls. The letter claimed that their mother, Deborah Dalla Costa, was subjecting the children to unnecessary medical treatments and procedures. The writers of the letter said that they were "gravely concerned" for the girls.

According to the letter, Deborah Dalla Costa was "obsessive about having something medically wrong with them." She had "taken them to countless doctors, and hospitals," and "exaggerates and lies about her children's medical issues constantly." Her obsession had an impact on the children, who had to endure "many procedures . . . including surgeries."

That letter set in motion a chain of events that culminated in the removal of the children from the home. Along the way, the investigation confirmed that the children had received large quantities of medication. The girls had received treatment at quite a few hospitals, including Lurie, Loyola, Rush, Methodist, Franciscan Alliance, Community Healthcare System, and

Comer Children's Hospital.  There were other oddities, too – Deborah Dalla Costa thought that the oldest girl needed a wheelchair at school, but the child seemed normal to the caseworker.

A few days after the initial removal of the children, DCS filed a petition with the Juvenile Court in Indiana.  The Juvenile Court found no probable cause for a finding of abuse or neglect. But DCS continued to investigate.  A doctor from Comer Children's Hospital at the University of Chicago Medical Center expressed concerns that the children were suffering from medical child abuse.

Within a week, DCS allegedly strong-armed the parents into sending one of the girls to Comer Hospital, where she ended up staying for almost two weeks.  DCS later filed a second petition, and the Juvenile Court put one of the children in foster care.

Within a few months, the Juvenile Court dismissed both petitions, and the family was reunited.  Deborah Dalla Costa and her husband, Kenneth Dalla Costa, responded by filing suit. They brought a basket of claims against the DCS caseworkers, and against doctors and social workers associated with Comer Children's Hospital.

This Court previously dismissed the Hospital Defendants, so only the two DCS caseworkers remain.  After discovery, Defendants moved for summary judgment, largely based on qualified immunity.

For the following reasons, Defendants' motion for summary judgment is hereby granted.

## Background

### I.     The Anonymous Letter

The story begins with an anonymous letter received by the Indiana Department of Child Services on September 16, 2019.  *See* Letter (Dckt. No. 82-13, at 4 of 12).  Someone dropped off

the letter to Green Pediatrics, who then faxed the letter to DCS. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 11 (Dckt. No. 93); Letter (Dckt. No. 82-13, at 4 of 12).

The authors of the typewritten letter didn't reveal their identities. The only clue was the use of the plural pronoun "we."

The origin and authorship of the letter remain a mystery. For now, the important thing is that the letter landed in the hands of DCS, an agency that exists to protect children.

The writers of the letter expressed serious concern about the well-being of the children in the Dalla Costa family. Kenneth and Deborah Dalla Costa are the parents of three girls: AA, BB, and CC. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 11 (Dckt. No. 93). At the time, all three girls were under the age of 10.

"We are writing to you because we are gravely concerned for the Dalla Costa Children[.] Their mother, Debi Dalla Costa, has become obsessive about having something medically wrong with them. It has been an ongoing problem for many years, but has escalated in the past year." *See* Letter (Dckt. No. 82-13, at 4 of 12).

The letter accused the mother of abusing her children through excessive medical care for non-issues. Basically, the mother was fixating on searching for medical problems that the children didn't have. "Debi stays up all hours of the night obsessing over peer reviewed medical journals, to find the next thing to be wrong with her children." *Id.*

The letter offered details about the excessive medical care. "She has taken them to countless doctors, and hospitals. She has had many procedures, test[s], and blood work done on her 3 children, including surgeries." *Id.*

The letter added that the mother didn't tolerate anyone questioning the need for medical care, either. "As soon as people question why so many medical tests and treatments are needed,

3

or if she feels a medical professional suspects Munchausen syndrome by proxy, she changes doctors and goes to another hospital." *Id.*

The writers thought that the medical care had more to do with the obsessiveness of the mother than the legitimate medical needs of the children. Deborah Dalla Costa "has a need for attention, that she gets from her children being medically needy. She exaggerates and lies about her children's medical issues constantly." *Id.*

The letter ended with a plea for help. "Please look into this further in order that Debi can get the help that she needs." *Id.*

The letter attached three pages that summarized the Facebook posts of Deborah Dalla Costa from July to September 2019. *Id.* at 5–7. The Facebook posts included details about the medical care of the children. In the posts, the mother summarized medical appointments, complained about specialists, and expressed exasperation with the medical struggles of her children. *Id.*

When it faxed the letter to DCS, Green Pediatrics also included a medical record from a visit that AA had with her doctor at Green Pediatrics on September 13, only a few days earlier. *See* Medical Records (Dckt. No. 83-3, at 8–12 of 12). Mrs. Dalla Costa wanted a letter from the doctor so that AA could use a wheelchair at school. *Id.*

## II.     The First Assessment

DCS responded to the tip by assigning the case to Samantha Ilic, a Family Case Manager. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 3, 12 (Dckt. No. 93). She did the leg work to investigate the allegations and prepare a case assessment.

Ilic kicked off the investigation on September 19, 2019. Ilic emailed Lisa Kuntz from Comer Children's Hospital at the University of Chicago, and copied Lindsay Forrey. *Id.* at ¶ 13.

4

The record doesn't reveal the job title of Kuntz – the parties simply say that she worked at Comer Children's Hospital. *Id.* at ¶ 13. Forrey is a licensed clinical social worker, and has worked at Comer Children's Hospital since 2008. *Id.* at ¶ 7.

Ilic wrote that she had a "Munchausen case and the kiddo has been to Comer." *See* Defs.' Ex. 51, at 2 (Dckt. No. 82-42). Ilic asked if Kuntz could "do some digging for me." *Id.*

Munchausen syndrome, now known as factitious disorder, is a mental health disorder. *See Factitious disorder*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/factitious-disorder/symptoms-causes/syc-20356028 (last visited March 18, 2025). A person with Munchausen syndrome repeatedly deceives others by pretending to act sick, even though that person is healthy. *Id.* Munchausen syndrome by proxy occurs when parents falsely present their children as mentally or physically unhealthy. *Id.*

Later that day, Ilic made a trip to the school and spoke with the three girls. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 14 (Dckt. No. 93).

Ilic then went to their home and spoke with the parents. *Id.* During that visit, Deborah Dalla Costa tried to pull together the medical records. *Id.* at ¶ 15. But she mostly pulled together handwritten notes.

The parents shared information about the health of AA, who was getting treatment for pain management from a doctor (Dr. Lubenow). *Id.* at ¶ 16. The parents revealed that AA had suffered from a headache for the last 18 or 19 days, and it wouldn't go away. *Id.* at ¶ 17.

They reported that AA felt tired throughout the day, and had tingling in her feet and hands. *Id.* The numbing got worse throughout the day, and by 3:00 p.m., AA needed to use a wheelchair. *Id.*

Deborah Dalla Costa shared information about AA's treatment, but didn't provide any medical records (except one). *Id.* at ¶ 20. Instead, she provided a handwritten list of AA's diagnoses, and a progress note from Dr. Lubenow. *Id.* at ¶ 18. She also gave Ilic a list of the medications that the kids were taking. *Id.*

Ilic took pictures of the documents, and took pictures of the children's medications. *Id.* at ¶ 19. And then she left.

## III.    The First Removal

Ilic returned to the school and picked up the children. *Id.* at ¶ 24. She didn't take them home. Instead, she took them to Melissa Lara, a Family Case Manager Supervisor with DCS. *Id.* at ¶¶ 4, 24. Later that day, Lara took the kids home and placed them under the care of their aunt. *Id.* at ¶ 24.

Meanwhile, as Ilic had requested in her email, Forrey (again, from Comer Children's Hospital) looked up information in the hospital's database about AA's medical care. She sent Ilic a response email that afternoon, after Ilic had already removed the children. Forrey confirmed that the children had received lots of medical care.

"Yep, loads of records in many places. I see [AA] has gone to Lurie, Loyola, Rush, Methodist, Franciscan Alliance, Community Healthcare System and Comer. She was last seen here in May and before that February. Are you looking for anything specific?" *See* Defs.' Ex. 51, at 1 (Dckt. No. 82-42).[1]

For the next four days, the kids stayed in their home with their aunt, Kathy Dalla Costa. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 22, 25, 27 (Dckt. No. 93). Kenneth and

---

[1] Defendants clarify that Ilic received Forrey's email *after* Ilic had already picked up the children from their school. *See* Pls.' Reply, at 9 n.9 (Dckt No. 104). Defendants mentioned Forrey's email to indicate that Ilic's concerns were valid, not that the email motivated Ilic to pick up the children from school. *Id.*

Deborah Dalla Costa (*i.e.*, the parents) stayed down the street at the home of Deborah's parents. *Id.* at ¶ 27. That arrangement remained in place from September 19 to 23, 2019. *Id.*

The record isn't clear about how, exactly, this arrangement came about. The parties didn't address whether the parents objected, or whether the parents agreed to this arrangement, or something in between. The parties also didn't explain how DCS had the authority to take the children from their parents.

For now, the key point is that DCS took action on September 19, and the children no longer resided with their parents. They stayed at home with their aunt.

At the time, Ilic had a number of concerns, including whether the kids were taking excessive medications. *Id.* at ¶ 23. She suspected possible "doctor-shopping." *Id.* She also suspected that the parents had self-diagnosed the children with health conditions. *Id.*

On September 20, Ilic made a pediatrics referral to Riley Children's Hospital, which is part of Indiana University Health. *Id.* at ¶ 26. She did so based on her concerns about the kids' diagnoses and medications. *Id.* She also wanted guidance on how to proceed. *Id.*

DCS decided to go to court to protect the children.

On September 20, DCS filed something called a Report of Preliminary Inquiry in Juvenile Court in Indiana. *Id.* at ¶ 28; Defs.' Ex. 41, at 1 (Dckt. No. 83-14). The report spanned more than 10 pages, and offered a detailed summary of the children's health, medical care, and home life. *See* Defs.' Ex. 41 (Dckt. No. 83-14).

The report summarized the anonymous tip, and outlined the medical information learned in the four-day investigation. For example, the report listed seven prescription medications taken by AA, plus eight over-the-counter medications and treatments (such as CBD oil). *Id.* at 5.

7

The report also flagged the lack of supporting medical records from the parents. "The parents cannot provide any documentation of the children's diagnoses and from what medical documentation DCS has received, it appears Mrs. Dalla Costa self-reports diagnoses to doctors and they are entered into the chart without being confirmed." *Id.* at 4.

The report gave a list of hospitals that have treated the children. "The children are being treated / have been seen at Lurie, Loyola, Rush, Methodist, Franciscan Alliance, Community Healthcare System and Comer." *Id.*

The report added the following nugget: "The parents have hosted fundraisers for the children's medical conditions and have received over $10,000 from their church." *Id.*

On the morning of September 23, the Juvenile Court found that there was "probable cause to believe that said children are 'Children in Need of Services'" (which apparently goes by the unfortunate acronym "CHINS"). *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 28 (Dckt. No. 93); Defs.' Ex. 42 (Dckt. No. 83-15).

The Juvenile Court set a detention hearing for later that morning. The Juvenile Court also issued an order authorizing DCS to file a Petition Alleging Children in Need of Services (a so-called "CHINS petition"). *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 28 (Dckt. No. 93); Defs.' Ex. 42 (Dckt. No. 83-15).

Before long, DCS filed a four-page petition. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 28 (Dckt. No. 93). DCS alleged that the physical or mental condition of each of the three girls was "seriously impaired or seriously endangered as a result of the inability, refusal, or neglect" of the parents. *See* Defs.' Ex. 43 (Dckt. No. 83-16) (the first CHINS petition dated Sept. 23, 2019).

8

The petition included fewer details than the report, but it did offer some highlights about the health and treatment of the children. For example, the parents reported that AA suffered from "chronic, excruciating pain." *Id.* But Ilic watched AA "actively playing without any apparent issues." *Id.*

Also, the parents took AA out of school at 11:10 a.m. every day, apparently for medical reasons. *Id.* But her primary care doctor would not provide a report saying that she needed it. *Id.*

The Juvenile Court held the detention hearing later that morning. Kenneth and Deborah Dalla Costa attended, with their counsel. Ilic and several others from DCS attended, too.

Based on the record, the Juvenile Court reversed course and found that there was "no probable cause." *See* Defs.' Ex. 29 (Dckt. No. 83-7) (the order dated Sept. 23, 2019); Pls.' Resp. to Defs.' Statement of Facts, at ¶ 30 (Dckt. No. 93).

It's not clear why the state court judge changed his mind. The summary judgment record does not shed light on the state court's change in course.

In any event, on September 23, the Juvenile Court dismissed the CHINS petition and released DCS of "any responsibility for care and placement of the children." *Id.*

The Dalla Costa parents then moved back home with their kids. *Id.* at ¶ 31.

## IV.     The Medical Evaluation

DCS did not end its investigation after the dismissal of the CHINS petition. At that point, Ilic had worked on the case for only a few days. She had not received a complete collection of medical records, and she had not yet completed the case assessment. So she kept working, and kept digging.

9

At deposition, Ilic explained why she kept going. "[T]he State and the [Juvenile] Court are two different entities. Now, the Court can say, you don't have probable cause to be here, but I still have an assessment to finish that I can't close until certain things are still met." *See* Ilic Dep., at 132:11-15 (Dckt. No. 82-7).

"I had 45 days to complete the assessment, which means that my work wasn't done. . . . I had to either substantiate or unsubstantiate the allegations in the case. They don't let you just close the assessment." *Id.* at 132:16-22.

Ilic didn't feel comfortable closing the case assessment without any medical records. "The only way I was going to close that assessment down without re-filing was to get medical records." *Id.* at 140:5-9.

Ilic called hospitals to get the medical records for the children. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 33 (Dckt. No. 93).

On September 25, 2019, Ilic spoke with Dr. Roberta Hibbard, a child abuse pediatrician at Riley Children's Hospital. *Id.* at ¶ 34.

Later that day, Ilic received an email from Dr. Ramaiah at Comer Children's Hospital. *Id.* at ¶ 36. At the time, Dr. Ramaiah was an assistant professor of pediatrics. *Id.* at ¶ 5. She is a child abuse pediatrician. *Id.*

Dr. Ramaiah summarized the visits by the children to that hospital. *Id.* at ¶ 36. She commented that "there are a lot of visits," and that "[s]ome seem legitimate and some seem out of proportion." *See* Defs.' Ex. 12 (Dckt. No. 82-16).

Dr. Ramaiah agreed with Ilic's concerns about the children. She opined that the "pattern seen here is highly concerning for MCA," meaning medical child abuse. *Id.* "I completely

10

understand and agree with your concerns for MCA especially in light of hearing about even[t]s occurring outside of COMER and information you have obtained from other physicians." *Id.*

Dr. Ramaiah added reasons for her concerns. "[T]he mom is stating the children have celiac disease even though testing is negative." *Id.* And the "multitude of complaints is concerning in children who I suspect are relatively healthy children." *Id.*

"Physicians want to be helpful and always walk into a room believing the parents have the child's best interest at heart. It is difficult for most physicians to comprehend that in rare instances that is not the case." *Id.*

Dr. Ramaiah offered to help if Ilic concluded that the kids needed an evaluation at Comer Children's Hospital. *Id.*

On September 27, 2019, Kenneth and Deborah Dalla Costa received a call from their attorney. *Id.* at ¶ 37. The attorney shared that he had received a call from someone at DCS (maybe from Ilic, but the parties don't pin it down).

The parties have a different take on what DCS said during that call with the attorney.

According to the lawyer for the Dalla Costas, DCS represented that it would not refile any petition if the parents took AA to Comer Children's Hospital for an evaluation. *Id.* But if the parents refused the medical examination, then DCS would file another petition. *Id.*

According to Ilic, that's not what she said at all. Her position was simply that she could not close the case assessment without a medical evaluation by a child abuse doctor. *Id.* at ¶ 38; Ilic Dep., at 136:1-5, 137:1-11 (Dckt. No. 82-7) ("[I]n order to close the assessment there are certain steps that had to be done. . . . The children had to be observed in the hospital, because that was the recommendation of the CAPS and the PEDS team. So the state – well, I was told I

11

couldn't submit my assessment without having those steps taken. . . . [AA] had to be evaluated by a child abuse doctor.").

On September 28, 2019, Deborah Dalla Costa removed herself from the home and went back to her parents. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 39 (Dckt. No. 93). Nobody told her that she had to leave her home. But in light of the phone call from the attorney, she figured that removing herself was the "way to keep our children together, keep them in our home, keep them with Dad." *See* Deborah Dalla Costa Dep., at 47:5-16 (Dckt. No. 82-1).

Kenneth Dalla Costa decided to take AA to Comer Children's Hospital for an evaluation. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 42 (Dckt. No. 93). AA was admitted on September 30, 2019. *Id.* at ¶ 44. She ended up staying almost two weeks.

Dr. Ramaiah met with the parents two days after AA was admitted. *Id.* at ¶ 49. She reported that the hospital had reduced AA's medications. *Id.*

In the end, Dr. Ramaiah and the pediatric medical team diagnosed AA with medical child abuse. *Id.* at ¶ 50; Ramaiah Dep., at 41:11 – 42:3 (Dckt. No. 82-6). The hospital communicated that diagnosis to DCS. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 54 (Dckt No. 93).

Dr. Ramaiah finished a twelve-page report on October 3, 2019. *Id.* at ¶ 52. The report offered a deep-dive into AA's medical history and condition. It identified, for example, eleven scheduled medications that the child was taking, plus four as-needed medications, plus fourteen supplements. *See* Defs.' Ex. 3 (Dckt. No. 83-2).

Based on the hospital stay, Dr. Ramaiah concluded that AA was "actually a much healthier child than presented by the parents." *Id.* at 2. AA "has actually acted like a normal child." *Id.* at 9 (giving over a dozen examples from the hospital stay).

The report faulted Deborah Dalla Costa for "[s]eeking medical care excessively," "[p]roviding misleading information to medical providers," and "[e]xaggerating medical symptoms." *Id*. at 2. The mother "seems to be the driving force behind the MCA," and "for the mother, meeting her own needs has superseded the trauma to her child." *Id.* at 3.

Dr. Ramaiah concluded that the child "meets the criteria for medical child abuse." *Id.* at 2. The physician spotted "numerous instances that meet the above criteria," and found that the girl had "suffered from unnecessary and excessive medical care." *Id.*

Dr. Ramaiah included a list of six recommendations to consider, including "clear identification of her true medical diagnoses" and "[p]sychiatric evaluation of parents." *Id.* at 2–3.

The final and "most impactful" recommendation was "[r]emoval from the parents." *Id.* at 3. "Our experience is that when there is no intervention with the entire family, the pathological pattern continues producing permanent physical and psychological damage to the child." *Id.*

## V.     The Second Assessment

On October 4, 2019, Ilic emailed Melissa Lara (again, the DCS supervisor) about the diagnosis. *Id.* at ¶ 56. Lara called the DCS hotline, and DCS opened another assessment. *Id.* at ¶¶ 56–57. Once again, Ilic handled the assignment.

Meanwhile, AA remained at Comer Children's Hospital. She stayed there for nearly two weeks, from September 30 to October 11, 2019. *Id.* at ¶ 58. Ilic and Lara didn't visit her. *Id.* at ¶¶ 59, 61. But Deborah Dalla Costa did visit AA on most days. *Id.* at ¶ 61.

On October 9, DCS went back to Juvenile Court and filed a second Preliminary Inquiry. *Id.* at ¶ 62. The report stated that DCS had received a referral about the children on October 4, 2019 (presumably meaning the report from Dr. Ramaiah). *See* Defs.' Ex. 46 (Dckt. No. 83-18).

13

Once again, DCS alleged that the "children's physical or mental condition is seriously impaired or seriously endangered as a result of the inability, refusal, or neglect" of the parents. *Id.* at 7. DCS requested placing the children in foster care. *Id.* at 11.

On October 10, the Juvenile Court found probable cause to believe that the children qualified as Children in Need of Services. So the Juvenile Court authorized DCS to file a second Petition Alleging Children in Need of Services. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 62 (Dckt No. 93); Defs.' Ex. 44 (Dckt. No. 83-17).

DCS promptly filed the second CHINS petition. *See* Defs.' Ex. 31 (Dckt. No. 83-9) (the second CHINS petition dated Oct. 10, 2019). The five-page petition summarized the medications, and added that Dr. Ramaiah had diagnosed AA as a victim of medical child abuse. *Id.* at 3.

"The parents have a history of excessively seeking medical care for their children." *Id.* AA "presented nearly thirty prescription and over-the-counter medications" when she was admitted at Comer Children's Hospital. *Id.* The doctors couldn't verify the symptoms reported by the parents. *Id.*

In fact, AA seemed like a "much healthier child than presented by the parents." *Id.* Overall, AA "has been physically harmed by repeated medical treatments, excessive medications, unnecessary testing, and unwarranted procedures." *Id.*

"When the parents learned of the Medical Child Abuse diagnosis, they voiced concerns about losing their jobs and going to jail, but not unnecessary medical treatment for their child." *Id.* at 4.

14

The Juvenile Court held a detention hearing later that day. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 63 (Dckt. No. 93). The Juvenile Court took the matter under advisement, and set another hearing for the next day. *Id.* at ¶ 65.

On October 11, the Juvenile Court "found probable cause to believe that the child is a child in need of services." *See* Defs.' Ex. 33, at 1 (Dckt. No. 83-11).

The Juvenile Court held an immediate detention hearing. DCS recommended that the Juvenile Court place all three children in foster care.

The Juvenile Court accepted that recommendation, in part. The Juvenile Court placed AA in foster care, but ordered that BB and CC could remain at home with their parents. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 65 (Dckt. No. 93); Defs.' Ex. 33, at 2 (Dckt. No. 83-11).

## VI.    The Aftermath

AA remained in foster care in the weeks that followed. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 69 (Dckt. No. 93).[2] But she didn't stay in foster care for very long.

On October 15, only four days after the ruling, the parents went back to the courthouse and asked the Juvenile Court to allow AA to return home to live with her father. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 69 (Dckt. No. 93); Defs.' Ex. 34 (Dckt. No. 83-12).

Meanwhile, Dr. Ramaiah sent a follow-up letter on October 25, 2019, reiterating that she was "extremely worried" about all three children. *See* Defs.' Ex. 47 (Dckt. No. 82-38). "The diagnosis of MCA [medical child abuse] is already established but there is now additional,

---

[2] The Court notes a discrepancy in the facts about when AA left Comer Hospital, and when she was taken to the foster home. In paragraph 69, the parties agree that AA was in foster care from October 10 to October 31. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 69 (Dckt. No. 93). But in paragraph 66, the parties agree that AA was discharged from Comer on October *11* (*i.e.*, the next day), and taken to a foster home. *Id.* at ¶ 66. But the difference is immaterial.

mounting evidence that the extent of the exaggeration of symptoms and false statements is even worse than we thought." *Id.*

The Juvenile Court held another hearing on October 29. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 69 (Dckt. No. 93); Defs.' Ex. 55 (Dckt. No. 83-20).

At that point in the narrative, the storytelling by the parties starts to suffer. Someway, somehow, AA returned home on October 31, 2019. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 69 (Dckt. No. 93).

The parties do not explain what changed, or how things went down. Presumably the Juvenile Court decided that AA didn't need foster care after all. The storytelling ends with whimper, leaving much to be desired.

The gaps in the storytelling feel a bit jarring to anyone who has followed the thread this far. In any event, AA went back home on Halloween. At that point, Deborah Dalla Costa continued to live down the block with her parents.

On November 7, 2019, DCS finished the first case assessment, meaning the assessment stemming from the report dated September 16, 2019. *Id.* at ¶ 73. DCS concluded that the allegation of child neglect was "unsubstantiated." *Id.*; *see also* Defs.' Ex. 24, at (Dckt. No. 83-5).

If you got this far in the story and are surprised that DCS reversed course, and concluded that the concerns about child abuse were unsubstantiated, you're not alone.

The Juvenile Court held a fact-finding hearing on the second CHINS petition on December 2, 2019, and again on December 5. *Id.* at ¶ 74. At the end of the hearing, the Juvenile Court dismissed the second CHINS petition. *Id.*

After that hearing, Deborah Dalla Costa finally moved back home, and the entire family was reunited. *Id.* at ¶ 70.

On December 19, 2019, DCS finished the second case assessment, meaning the assessment stemming from the report dated October 4, 2019. Once again, DCS concluded that the allegation of child neglect was "unsubstantiated." *Id.* at ¶ 77; Defs.' Ex. 40, at 4 (Dckt. No. 82-32).

## VII. The Lawsuit

Kenneth Dalla Costa and Deborah Dalla Costa responded to the ordeal by filing the case at hand, bringing a dozen claims. The defendants fell into two groups. The first group included the doctors from Comer Children's Hospital. The second group consisted of the case workers from the Indiana Department of Child Services.

Plaintiffs filed an amended complaint, and this Court trimmed the case at the motion-to-dismiss stage. This Court dismissed the claims against the Hospital Defendants. *See generally* 8/29/23 Mem. Opin. and Order (Dckt. No. 45); *see also* 4/12/24 Order (Dckt. No. 62).

At this point, only two defendants are left: Samantha Ilic and Melissa Lara, the two Indiana child welfare officers. Plaintiffs bring five claims.

The first two claims allege an unreasonable seizure in violation of the Fourth Amendment. The first claim is about the removal of the children from September 19 to September 23, 2019, meaning the days before the Juvenile Court heard the case. The second claim is about taking AA to Comer Hospital from September 30 to October 11, 2019.

The next claim alleges an unreasonable search under the Fourth Amendment. The claim is about the alleged search of AA during her stay at Comer Hospital.

17

The last two claims fall under the Fourteenth Amendment. One claim is a procedural due process claim, for refusing to investigate or consider exculpatory evidence. The other claim is a substantive due process claim, for interfering with parents' right to raise their children.[3] *See* First Am. Cplt., at ¶¶ 99–124 (Dckt. No. 26).[4]

After discovery, Defendants moved for summary judgment.

**Legal Standard**

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See* Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts in the light most favorable to the nonmoving party, giving the nonmoving party the benefit of all reasonable inferences. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008).

---

[3] Plaintiffs bring Count V against only Ilic, not Lara.
[4] Plaintiffs filed a second amended complaint late in the game. *See* Second Am. Cplt. (Dckt. No. 57). But the Court already struck that complaint. *See* 4/12/24 Order (Dckt. No. 62).

Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-movant. *See Celotex Corp.*, 477 U.S. at 322.

## Analysis

The claims fail for two overarching reasons: waiver and qualified immunity. Plaintiffs failed to make any argument in support of two of the claims, so any response is waived. Plaintiffs cannot get to trial on the other three claims, either, because Defendants have qualified immunity.

## I.    Waiver

The first problem is waiver. Plaintiffs abandoned two of the claims by failing to respond to the motion for summary judgment.

Count III is a Fourth Amendment claim about the alleged search of AA when she stayed at Comer Hospital from September 30 to October 11, 2019. *See* First Am. Cplt., at ¶¶ 113–17 (Dckt. No. 26). Nothing in the record supports that claim.

In the motion for summary judgment, Ilic and Lara argued that they never searched AA. *See* Defs.' Mem., at 4–5 (Dckt. No. 86). The Dalla Costas did not muster any response in their brief.

The record confirms that there is no factual basis for the claim. If anything, Plaintiffs admitted that there is none. In response to the statement of facts, the Dalla Costas admitted that Ilic and Lara never even visited AA when she was at Comer, except when Ilic picked her up and drove her to the foster home. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 59 (Dckt. No. 93).

Ilic and Lara pointed out the lack of factual support, and the Dalla Costas did not respond with any evidence. So the claim about an unreasonable search cannot survive.

19

The same goes for the Count IV, a procedural due process claim under the Fourteenth Amendment. In the complaint, the Dalla Costas alleged that Ilic and Lara refused to investigate, failed to consider exculpatory evidence, and suppressed or misrepresented the material facts. *See* First Am. Cplt., at ¶¶ 118–20 (Dckt. No. 26).

The complaint sketched the broad outlines of the claim. By the sound of things, the Dalla Costas alleged that Ilic and Lara had deceived the Juvenile Court. *Id.* at ¶ 77 ("Ilic and Lara's use of Ramaiah was concerted and intended to deceive the juvenile court."); *id.* at ¶ 95 ("Procedural due process rights are violated when . . . a defendant filed or conspired to file false statements with the court [or] [r]eports provided to the state court contained false information that the court relied upon when ordering the continued withholding of a child from parents."); *id.* at ¶ 119 ("Defendants' refusal to investigate or even consider exculpatory evidence and their suppression or misrepresentation of material facts caused the removal of the children on October 11, 2019 [*i.e.*, the date of the finding of probable cause by the Juvenile Court].").

In the motion for summary judgment, Defendants argued that there is no evidence that they ever misled the Juvenile Court. *See* Defs.' Mem., at 10 (Dckt. No. 86). The Dalla Costas did not respond. They did not point to any evidence in the record that could support a finding by a reasonable jury that they misled the state court.

The Dalla Costas did respond to a legal argument about absolute immunity. *See* Pls.' Resp., at 2 (Dckt. No. 92). But that's not enough to save the claim. Even if the Dalla Costas prevailed on that point, it would not matter. A legally viable claim with no evidentiary support is destined for the exits of the courthouse.

Summary judgment is the time for the non-moving party to put its evidentiary cards on the table. Summary judgment is "not a dress rehearsal or practice run; it is the put up or shut up

20

moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005). "A party seeking to defeat a motion for summary judgment is required to 'wheel out all its artillery to defeat it.'" *Caisse Nationale de Credit v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) (citation omitted).

The Dalla Costas had an obligation to respond and come forward with evidence to support their claims. The failure to respond constitutes a waiver. "The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment." *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014). After all, the non-moving party has an obligation to "inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered." *Mahran v. Advoc. Christ Med. Ctr.*, 12 F.4th 708, 713 (7th Cir. 2021) (citation omitted).

To sum up, Defendants pointed to a lack of evidence to support the unreasonable search claim and the procedural due process claim. In response, the Dalla Costas came up empty. The Court grants summary judgment to Defendants on Count III (the unreasonable search claim) and Count IV (the procedural due process claim).

## II.    Qualified Immunity

Only three claims remain, including two claims under the Fourth Amendment and one claim under the Fourteenth Amendment. Defendants asserted qualified immunity in response to each of the claims.

"Government officials enjoy qualified immunity from suit under § 1983 unless their conduct violates clearly established law." *Zorn v. Linton*, 607 U.S. ---, 2026 WL 795469, at *2 (2026).

"Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Lopez v. Sheriff of Cook County*, 993 F.3d 981, 998 (7th Cir. 2021).

"The doctrine of qualified immunity shields public officials from undue interference with their duties and from potentially disabling threats of liability." *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021) (quotation marks omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982)). The doctrine takes an eyes-wide-open approach to human behavior, and recognizes the disincentives that potential liability can have on government decision-making.

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011). The doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* (citation omitted).

The doctrine of qualified immunity recognizes the reality that the prospect of potential liability could have a chilling effect, and make government officials unduly skittish about doing their jobs. And that reticence could lead to inaction, to everyone's collective detriment. The fear of liability could create an incentive to err on the side of doing nothing, even when there is a potential need to do something.

"By protecting officials from the disruption that could result from fear of liability or insubstantial lawsuits, qualified immunity 'acts to safeguard government, and thereby to protect the public at large, not to benefit its agents.'" *Jones v. Clark*, 630 F.3d 677, 685 (7th Cir. 2011) (citation omitted).

To overcome qualified immunity, a plaintiff must clear two hurdles. "Upon a defendant's invocation of qualified immunity at summary judgment, the plaintiff shoulders the burden of demonstrating both that the defendant violated a constitutional right and that the constitutional right was clearly established at the time, such that a reasonable official would understand that what he is doing violates that right." *Mabes v. Thompson*, 136 F.4th 697, 705 (7th Cir. 2025) (cleaned up); *see also Jones*, 630 F.3d at 682.

A district court may address these questions "in either order." *See Smith*, 10 F.4th at 737. And "if *either* inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Id.* (emphasis in original) (citing *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019)).

"A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (*per curiam*) (citation omitted). That's a "demanding standard." *See District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).

"To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be settled law, which means it is dictated by controlling authority or a robust consensus of cases of persuasive authority." *Id.* (cleaned up).

The Supreme Court's "caselaw does not require a case directly on point for a right to be clearly established." *Kisela v. Hughes*, 584 U.S. 100, 104 (2018). Even so, "existing precedent must have placed the statutory or constitutional question beyond debate." *See White v. Pauly*, 580 U.S. 73, 79 (2017) (*per curiam*) (citation omitted); *Zorn*, 2026 WL 795469, at *2 ("A right is not clearly established if existing precedent does not place the constitutional question 'beyond debate.'") (citation omitted).

23

The level of generality looms large when it comes to defining the clearly established law. Invoking abstract legal principles won't cut it. The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." *Kisela*, 584 U.S. at 104; *Zorn*, 607 U.S. ---, 2026 WL 795469, at *2 ("Principles stated generally, such as that 'an officer may not use unreasonable and excessive force,' do not suffice."). The relevant precedent must define the right with a "high degree of specificity." *Wesby*, 583 U.S. at 63.

When it comes to cases about probable cause, the Seventh Circuit has distilled the second step of the qualified immunity analysis into the phrase "arguable probable cause." That is, an officer enjoys qualified immunity if the officer *arguably* had probable cause, meaning that the officer's conduct did not violate clearly established law. *See Abbott v. Sangamon County*, 705 F.3d 706, 714–15 (7th Cir. 2013) ("[W]hereas an arrest not supported by probable cause is a constitutional violation, an arrest not supported by arguable probable cause is a violation of a 'clearly established' constitutional right.") (internal citation omitted); *see also Mwangangi v. Nielsen*, 48 F.4th 816, 825 (7th Cir. 2022) ("If an officer has 'arguable probable cause' . . . we cannot say that the officer violated the plaintiff's clearly established constitutional rights."); *Gutierrez v. Kermon*, 722 F.3d 1003, 1008 (7th Cir. 2013) ("An arrest without probable cause is a violation of a constitutional right, whereas an arrest without arguable probable cause is a violation of a clearly established constitutional right.").

Arguable probable cause exists when a "a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question could have reasonably believed that probable cause existed in light of well-established law." *See Huff v. Reichert*, 744 F.3d 999, 1007 (7th Cir. 2014) (cleaned up).

24

The first step in the qualified immunity analysis asks whether a reasonable officer *would* have had probable cause. The second step in the qualified immunity analysis asks whether a reasonable officer *could* have believed that he or she had probable cause, based on clearly established law.[5]

Defendants often receive qualified immunity in child-removal cases, given the exercise of judgment required and the sensitive balancing of interests. "A parent has a right to familial relations, but that right is qualified by the State's interest in protecting children. The balance

---

[5] Sometimes a small letter at the beginning of a helping verb makes a big difference. *Hear generally* TAYLOR SWIFT, *Would've, Could've, Should've* (2022). Some Seventh Circuit cases say "could have," and some cases say "would have," when describing the standard for probable cause in the first step of the qualified immunity analysis. *See, e.g.*, *Mabes*, 136 F.4th at 708 ("Probable cause is an objective inquiry, focused in these circumstances on whether 'a prudent caseworker (meaning one of reasonable caution) *could have believed* that [the children] faced an immediate threat of abuse.'") (emphasis added); *Xiong*, 700 F.3d at 290 ("The probable cause inquiry is an objective one, focused on the facts known to defendants at the time the removal decision was made and upon whether a 'prudent caseworker (meaning one of reasonable caution) *could have believed* that [the child] faced an immediate threat of abuse based on those facts.'") (emphasis added); *Siliven*, 635 F.3d at 927 ("Our focus is on the facts and circumstances known to defendants at the time they decided to remove C.S., and whether a prudent caseworker (meaning one of reasonable caution) *could have believed* that C.S. faced an immediate threat of abuse based on those facts.") (emphasis added); *Hernandez*, 657 F.3d at 475 (same); *Pierner-Lytge v. Hobbs*, 60 F.4th 1039, 1043 (7th Cir. 2023) (Flaum, J.) ("Probable cause exists 'when a reasonable officer with all the knowledge of the on-scene officers *would have believed* that the suspect committed an offense defined by state law.'") (emphasis added); *Jump v. Village of Shorewood*, 42 F.4th 782, 789 (7th Cir. 2022) ("[Probable cause] exists at arrest when a reasonable officer with all the knowledge of the on-scene officers *would have believed* that the suspect committed an offense defined by state law.") (emphasis added). The Seventh Circuit in *Pierner-Lytge* used "would have" for the first step of the qualified immunity analysis (*i.e.*, the existence of probable cause), and used "could have" for the second step of the analysis (*i.e.*, the violation of clearly established law). *See Pierner-Lytge*, 60 F.4th at 1043, 1045–46; *accord Abbott*, 705 F.3d at 714 ("The probable-cause standard inherently allows room for reasonable mistakes, but qualified immunity affords an added layer of protection by shielding officers from suit for damages if a reasonable officer *could have believed* [the arrest] to be lawful, in light of clearly established law and the information the [arresting] officers possessed.") (emphasis added) (cleaned up); *Jones*, 630 F.3d at 684 ("Here, the officers are entitled to qualified immunity only if they *had probable cause* to arrest her *or* if a reasonable officer in their position *could mistakenly have believed* that probable cause existed.") (emphasis added). But on this record, it makes no difference.

between these interests is 'nebulous at best,' so most defendants in child-removal cases are entitled to qualified immunity." *See Royal v. Payne*, 2022 WL 4008718, at *2 (7th Cir. 2022) (citation omitted); *see also Brokaw v. Mercer County*, 235 F.3d 1000, 1023 (7th Cir. 2000) (agreeing with other Circuits that it is "generally the case" that "social workers and other state actors who cause a child's removal are entitled to qualified immunity").

Qualified immunity gives protection to people who protect little people. Child protection officers "often find themselves tasked with making difficult decisions on tight timelines that carry significant consequences." *See Mabes*, 136 F.4th at 713. "It is in a context like this one that qualified immunity has a particularly important role to play." *Id.*

Qualified immunity is an affirmative defense. *See Mabes v. Thompson*, 136 F.4th 697, 706 (7th Cir. 2025). A district court must assess qualified immunity claim-by-claim, and defendant-by-defendant. *Id.*

The Court will address the claims one-one-one. The first claim is an unreasonable seizure claim about the removal of the children from September 19 to 23, 2019, before the first hearing before the Juvenile Court. The second claim is an unreasonable seizure claim about taking AA to Comer Hospital from September 30 to October 11, 2019. The last claim is a substantive due process claim under the Fourteenth Amendment about interfering with their parental rights.

### A.      Unreasonable Seizure – September 19 to 23

The first claim is a Fourth Amendment claim about the seizure of the kids from September 19 to 23, 2019. *See* First Am. Cplt., at ¶¶ 99–107 (Dckt. No. 26).

The Fourth Amendment prohibits unreasonable searches and seizures. *See* U.S. Const. amend. IV; *see also United States v. Mays*, 819 F.3d 951, 955 (7th Cir. 2016) ("The Fourth

Amendment only protects against unreasonable searches and seizures."). Taking children away from their parents is a seizure. *See Xiong v. Wagner*, 700 F.3d 282, 290 (7th Cir. 2012); *Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 474 (7th Cir. 2011); *Brokaw*, 235 F.3d at 1010.

The parties take it as a given that the separation of the parents and the children from September 19 to 23 counts as a seizure. So the Court will too.

That said, the record leaves a little something to be desired on this point. On September 19, Samantha Ilic picked up the children from school and took them to Melissa Lara. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 24 (Dckt. No. 93). Lara, in turn, took the children to their home. *Id.*

The children stayed at home, with their aunt, until September 23. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶¶ 22, 25, 27 (Dckt. No. 93). Meanwhile, the parents stayed down the street at the home of Deborah's parents. *Id.* at ¶ 27.

The parties don't explain how all of that went down. Presumably DCS compelled the separation of the parents and the children. If so, that's a seizure. A compelled separation of a family is a seizure. The fact that the children stayed at home doesn't matter. The separation is enough.

The parties agree that DCS seized the children within the meaning of the Fourth Amendment. The next question is whether the seizure was unreasonable.

"In the context of removing a child from his home and family, a seizure is reasonable if it is pursuant to a court order, if it is supported by probable cause, or if it is justified by exigent

27

circumstances, meaning that state officers have reason to believe that life or limb is in immediate jeopardy."[6]  *See Brokaw*, 235 F.3d at 1010 (citation omitted); *see also Mabes*, 136 F.4th at 708.

Two of those possibilities don't apply here.  The removal of the children took place on September 19, four days before the hearing in Juvenile Court on September 23.  So there wasn't a court order when the initial separation occurred.  Defendants don't point to exigent circumstances, either.  It is not as if DCS took the children when they were en route to the hospital for surgery.

The question is whether Defendants had probable cause for the removal.  Probable cause "is an objective inquiry."  *See Mabes*, 136 F.4th at 708.  The focus is on what a "prudent caseworker (meaning one of reasonable caution)" would have believed, based on the facts at the time.  *Id.*

When it comes to qualified immunity, the question is not whether there was, in fact, probable cause for the removal of the child.  The question is whether "a reasonable caseworker *could have believed* that probable cause existed and accordingly wouldn't have understood his actions to violate a constitutional right."  *See Xiong*, 700 F.3d at 290 (emphasis in original).

---

[6] The line between probable cause and exigent circumstances might blur in a child abuse case.  In *Mabes*, the Seventh Circuit described probable cause as an "immediate *threat* of abuse," and described exigent circumstances as a scenario where "life or limb is in immediate jeopardy."  *See Mabes*, 136 F.4th at 708 (citation omitted) (emphasis added).  The difference might involve the immediacy of the harm to the child.  Most cases in the Seventh Circuit separate probable cause and exigent circumstances.  But at least one case seemed to fold them together.  *See Hernandez*, 657 F.3d at 486 ("[G]overnment officials may remove a child from his home without a pre-deprivation hearing and court order if the official has probable cause to believe that the child is in imminent danger of abuse. . . . It does not suffice for the official to have probable cause merely to believe that the child was abused or neglected, or is in a general danger of future abuse or neglect. The danger must be imminent, or put another way, the circumstances must be exigent.").  On this record, the caseworkers had more than enough to conclude that the girls faced a serious risk of ongoing harm.  The girls were seeing doctors on a near-daily basis, undergoing procedures, and ingesting daily medications.

The focus is on whether a reasonable caseworker "could have believed that [the children] faced an immediate threat of abuse." *See Siliven v. Indiana Dept. of Child Servs.*, 635 F.3d 921, 927 (7th Cir. 2011).

The touchstone of the Fourth Amendment is reasonableness. A caseworker doesn't have to be *right*. A caseworker has to be *reasonable*.

Based on the record, viewing everything in a light favorable to the Dalla Costas as the non-movants, Ilic and Lara had probable cause for the removal of the children on September 19. A reasonable caseworker could have believed that the children faced an immediate threat of abuse.

The anonymous letter went a long way toward establishing probable cause. On September 16, DCS received a letter about the Dalla Costa children from Green Pediatrics. The authors of the letter didn't reveal their identities. But they did share plenty of concern about the welfare of the kids.

The authors of the letter were "gravely concerned for the Dalla Costa children." *See* Letter (Dckt. No. 82-13, at 4 of 12). The letter accused the mother of becoming "obsessive about having something medically wrong with them." *Id.*

The children bore the brunt of that obsession. "She has taken them to countless doctors, and hospitals. She has had many procedures, test[s], and blood work done on her 3 children, including surgeries." *Id.*

The problem was getting worse. "It has been an ongoing problem for many years, but has escalated in the past year." *Id.*

The mother "exaggerates and lies about her children's medical issues consistently." *Id.* She has a "need for attention," which she "gets from her children being medically needy." *Id.*

29

And she didn't respond well to push-back. "As soon as people question why so many medical tests and treatments are needed, or if she feels a medical professional suspects Munchausen syndrome by proxy, she changes doctors and goes to another hospital." *Id.*

The authors backed it up by attaching a three-page summary of Deborah Dalla Costa's recent posts on Facebook. *See* Letter Attachments (Dckt. No. 82-13, at 5–7 of 12). The attachment summarized Facebook posts about medical visits on July 3, July 9, July 17, July 26, July 31, August 1, August 7, August 29, August 31, September 4, and September 5. *Id.*

One post summarized a visit to the ER and a visit with the child's "pain management doc" for an "intractable migraine." *Id.* Another post said that the child's "feet hurt so bad" that she used a wheelchair at home. *Id.*

Other posts described visits with neurologists, cardiologists, and rheumatologists. They described interactions with doctors at Lurie Children's Hospital, Rush Hospital, Mayo Clinic, and a "neurosurgeon on the east coast." *Id.*

When it faxed the letter to DCS, Green Pediatrics also included several pages of medical records for AA. *See* Medical Records (Dckt. No. 83-3, at 8–12 of 12); *see also* 9/19/19 Email (showing that the fax was emailed to Ilic on September 19). The records included a summary of a doctor visit on September 13, only a few days earlier.

Apparently, at that appointment, the mother asked for a new letter from the doctor so that AA could go "on wheelchair to school." *See* Medical Records (Dckt. No. 83-3, at 8 of 12). The doctor was skeptical. "PATIENT IS ABLE TO WALK TODAY IN THE OFFICE WITHOUT PROBLEMS." *Id.* at 10 of 12 (all caps in original).

30

AA told the doctor that she had had a migraine for 21 days. But once again, the doctor doubted the story. "PATIENT DOES NOT APPEAR TO BE IN PAIN AND THE RESPONSE ALMOST SEEMED COACHED." *Id.* (all caps in original).

But the mother pushed for a particular diagnosis. "MOTHER TALKED THE ENTIRE VISIT AND DEMANDED SNF DIAGNOSIS BE ADDED TO PLAN OF CARE." *Id.* (all caps in original). The acronym "SNF" might have been a typo. The accompanying Facebook posts talked about the mother's concern about "SFN," which is Small Fiber Neuropathy. *See* Letter Attachments (Dckt. No. 82-13, at 5–6 of 12).

Based on the letter and the attachments, a reasonable caseworker would have plenty of reasons to believe that the children were at risk. By the sound of things, the medical *treatment* became physical *mistreatment*.

True, the letter was anonymous. In the criminal context, courts have shown caution and expressed skepticism when it comes to anonymous tips. *See Navarette v. California*, 572 U.S. 393 (2014); *Florida v. J. L.*, 529 U.S. 266 (2000); *Alabama v. White*, 496 U.S. 325 (1990). It depends on the content of the tip, plus the ability to corroborate what it says. Courts typically require some indicia of reliability, such as concrete details or verifiable facts.

But that argument isn't on the table. In their response brief, the Dalla Costas don't make any argument based on the fact that the letter was anonymous. One sentence in the background section says that the letter was anonymous, but that's it. *See* Resp. Brf., at 5 (Dckt. No. 92). So any such argument is waived.[7] *See G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012).

---

[7] On a related note, the Dalla Costas also do not argue that estoppel or any other preclusion doctrine applies when it comes to the Juvenile Court's finding on September 23 that there was no probable cause. That is, they don't argue that Ilic and Lara lacked probable cause for the removal from September 19 to 23 because the Juvenile Court later denied the CHINS petition and found no probable cause on September

31

In any event, DCS did not remove the children based on the anonymous letter alone. DCS sprung into action, and interviewed both the children and the parents.

Ilic went to the school first, and talked separately with each of the children. As an aside, the record on this point seems underdeveloped. In their statement of facts, the parties didn't get into the content of those interviews. That's unfortunate, because the children seemingly said some important things.[8] In any event, the important thing is that Ilic laid eyes on the children, and had the opportunity to assess their health first hand.

Ilic then went to the children's home and interviewed the parents. If anything, that interview should have heightened any concerns.

Deborah Dalla Costa did not provide Ilic with any medical records, with one exception. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 20 (Dckt. No. 93). She showed two pages of

---

23. So any such argument is waived, too. That said, the Juvenile Court found that there was no probable cause, but that finding was tied to the child welfare statute, not the Fourth Amendment. The Juvenile Court found that there was no probable cause to conclude that the girls were Children in Need of Services, as defined in the statute. *See* Defs.' Ex. 43 (Dckt. No. 83-16) (the first CHINS petition dated Sept. 23, 2019); Defs.' Ex. 29 (Dckt. No. 83-7) (the order dated Sept. 23, 2019); *see also* Ind. Code Ann. § 31-34-1-1 (defining "child in need of services"). Overall, the key point is that estoppel isn't an issue.

[8] The parties left some evidentiary meat on the table. The record does include documents that summarize what the children said. The Report of Preliminary Inquiry to the Juvenile Court (dated September 20) and the Assessment of Alleged Child Abuse or Neglect (dated November 7) provide tantalizing details. *See* Defs.' Ex. 41 (Dckt. No. 83-14); Defs.' Ex. 24 (Dckt. No. 83-5). According to those documents, all three children appeared to be healthy. But AA said that she "has so many doctors and is on so many medications that she cannot count." *See* Defs.' Ex. 24 (Dckt. No. 83-5, at 2 of 4). She said that she went to the doctor "almost daily." *Id.* BB said that "her mom thinks that she needs the same surgery that [AA] had." *Id.* CC said that she had a "head-banging disorder." *Id.* And so on. Even so, for whatever reason, the parties didn't include those details in the statement of facts. They didn't point to any testimony about what the children said, either. Maybe this Court could rely on the exhibits themselves, but there is a potential hearsay issue. The documents are out-of-court statements about out-of-court statements, so there is a potential double-hearsay problem. The second level isn't an issue because it is enough that it was said – it is enough that the children said what they said (plus, it could be admissible for its effect on the listener). But the first level is potentially an issue. The record needs admissible evidence that the children actually said it. Maybe a hearsay exception applies to the documents. Alternatively, one of the documents (to the Juvenile Court) was signed under penalty as perjury, so maybe this Court could treat it as an affidavit. In any event, this Court has already drilled down far enough. The key point is that an important part of the story seems underdeveloped.

records from a doctor visit at the Rush Pain Center for AA's back and abdominal pain on August 7, 2019. *See* Defs.' Ex. 27 (Dckt. No. 82-25). It included a list of 15 medications that AA was taking. *Id.*

Instead of medical records, Deborah Dalla Costa offered handwritten notes. She gave Ilic a handwritten list of medications that the girls were receiving. *Id.* at ¶ 18; Defs.' Ex. 25 (Dckt. No. 82-23). It was a long list.

Deborah Dalla Costa also gave a handwritten list of AA's diagnoses. Once again, it was a long list. *See* Defs.' Ex. 26 (Dckt. No. 82-24). It included Small Fiber Neuropathy.

Based on the overall record, this Court has little trouble concluding that Ilic and Lara had probable cause to remove the children from the custody of their parents on September 19. If anything, it's hard to see how a reasonable caseworker could have reached any other conclusion.

The caseworker reviewed a letter that sounded the alarm about the safety and welfare of the children. The letter attached summaries of Facebook posts, which described extensive medical ailments, physicians, procedures, and treatments. The letter also attached one medical record.

And then, the caseworker investigated. Ilic interviewed each of the children, and had the opportunity to assess their health first hand. And then, Ilic interviewed each of the parents. If anything, that interview should have made the alarm bells ring even louder.

Based on this record, Defendants had probable cause to remove the children from the custody of their parents on September 19. So, from a qualified immunity standpoint, the Dalla Costas have hit the end of the road.

33

This Court doesn't need to get into whether Defendants violated clearly established law. After all, a plaintiff must establish both a constitutional violation *and* a violation of clearly established law. *See Mabes*, 136 F.4th at 705.

But for good measure, this Court will simply note that the Dalla Costas haven't shown a violation of clearly established law, either. Again, a plaintiff must pin down the clearly established law with a "high degree of specificity." *See Wesby*, 583 U.S. at 63. General principles won't carry the day. *See City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 613 (2015) ("[The Supreme Court has] repeatedly told courts . . . not to define clearly established law at a high level of generality.") (quoting *al-Kidd*, 563 U.S. at 104).

Here, the Dalla Costas have not identified any clearly established law that should have given Defendants notice that they were committing a constitutional violation. In fact, they barely address the point at all.

The Dalla Costas simply cite a case for the proposition that caseworkers can't remove a child without probable cause. *See* Resp. Brf., at 13 (Dckt. No. 92). That's no better than saying that the police can't use excessive force, which isn't enough. *See Zorn*, 607 U.S. ---, 2026 WL 795469, at *2 ("Principles stated generally, such as that 'an officer may not use unreasonable and excessive force,' do not suffice.").

In sum, Defendants have qualified immunity and are entitled to summary judgment on the claim about the seizure from September 19 to 23. At the very least, Ilic and Lara had arguable probable cause, so they enjoy qualified immunity.

34

B.  **Unreasonable Seizure – September 30 to October 11**

The Dalla Costas also bring a second claim under the Fourth Amendment.  This time, they challenge the removal of AA from her parents on September 30, and her stay at Comer Hospital until October 11, 2019.  *See* First Am. Cplt., at ¶¶ 108–12 (Dckt. No. 26).

On this record, Ilic and Lara once again had probable cause.  A reasonable caseworker could have believed that AA faced a risk of abuse.  *See Siliven*, 635 F.3d at 927 (asking "whether a prudent caseworker (meaning one of reasonable caution) could have believed that [the child] faced an immediate threat of abuse based on those facts").  And the Dalla Costas have not shown that Ilic and Lara violated clearly established law.  So they are entitled to qualified immunity.

Once again, the starting point is the seizure.  And once again, the parties do not pin it down.  The question is not whether AA was seized.  After all, she did stay at Comer Hospital for almost two weeks.  The question is what role, if any, Ilic and Lara played in that episode.

The parties spend a lot of energy debating whether Kenneth Dalla Costa (the dad) took AA to Comer Hospital voluntarily, or whether he did so in response to a threat.  But they overlook an embedded issue of who made the so-called threat.

The Dalla Costas say that they received a phone call from their attorney, who relayed a communication from DCS.  According to the attorney, DCS wanted AA to go to Comer Hospital for an evaluation.  If the Dalla Costas took her to Comer, then DCS wouldn't file another CHINS petition.  But if the Dalla Costas didn't take her to Comer, then DCS would file another petition.  *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 37 (Dckt. No. 93).

35

Ilic testified that she said no such thing. At deposition, she explained that she couldn't close the case assessment until AA was evaluated by a doctor. *See* Ilic Dep., at 135:23 – 139:16 (Dckt. No. 82-7).

So, the Dalla Costas felt threatened, and Ilic testified that she didn't threaten anyone. But once again, there is a gap in the record. It's not clear *who* allegedly made the threats.

The Dalla Costas' statement of facts summarizes what they heard from their attorney. But it does not reveal where the attorney got the information. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 37 (Dckt. No. 93). The paragraph talks about "DCS," and does not mention Ilic or Lara.

At deposition, Kenneth Dalla Costa testified about what he heard from his attorney about what "DCS" had said. *See* Kenneth Dalla Costa Dep., at 31:10 – 33:10 (Dckt. No. 82-2). He didn't know who from "DCS" had spoken with his attorney. "[O]ur attorney had said that he had told DCS – again, I don't know who that was, if it was their counsel, if it was Ilic, if it was Lara, who it was." *Id.* at 33:7-10.

So, the Dalla Costas believe that DCS threatened them. But they didn't come forward with evidence that Ilic or Lara threatened them. And that's a big problem.

Under section 1983, state actors are "accountable only for their own misconduct." *See Hess v. Garcia*, 72 F.4th 753, 767 (7th Cir. 2023). A "government official is liable only if he personally caused or participated in a constitutional deprivation." *See Milchtein v. Milwaukee Cnty.*, 42 F.4th 814, 824 (7th Cir. 2022).

It is not the job of a district court to dig ditches into the record, pull out the evidence detector, and go on a hunt to find supporting facts. "Judges are not like pigs, hunting for truffles buried in the record." *Gross v. Town of Cicero*, 619 F.3d 697, 702 (7th Cir. 2010) (cleaned up);

36

*MAO-MSO Recovery II, LLC v. State Farm*, 994 F.3d 869, 876 (7th Cir. 2021) ("[W]e have repeatedly held that is not the responsibility of the district court to dig through the record to find evidentiary support for a party's summary judgment arguments.").

A search for evidence shouldn't become the judicial equivalent of fracking, with a lot of energy blasted down until something useful seeps out.

Again, "[a] party seeking to defeat a motion for summary judgment is required to 'wheel out all its artillery to defeat it.'" *Caisse Nationale de Credit v. CBI Indus., Inc.*, 90 F.3d 1264, 1270 (7th Cir. 1996) (citation omitted). Here, the Dalla Costas keep firing blanks.

The Dalla Costas needed to come forward with evidence that could support a finding in their favor by a reasonable jury. An unreasonable seizure claim against Ilic and Lara about AA's visit to Comer Hospital requires evidence that they played a role in that seizure.

Maybe that's what happened. Maybe evidence is buried in the record somewhere. But the Dalla Costas didn't flag it, and it's not this Court's job to keep searching. The lack of evidence that Ilic and Lara orchestrated AA's visit to Comer Hospital on September 30 is an independent ground for summary judgment in their favor.

But it's not the only basis for judgment in their favor. Defendants would be entitled to summary judgment even if the Dalla Costas had offered evidence to support their version of the facts.

For starters, Ilic and Lara had probable cause to believe that AA was at risk as of September 30, the day she went to Comer Hospital.

On September 25, 2019, Ilic spoke with Dr. Roberta Hibbard, a child abuse pediatrician at Riley Children's Hospital. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 34 (Dckt. No. 93).

37

Dr. Hibbard relayed that she had spoken with Dr. Ramaiah at Comer Children's Hospital, and the two of them agreed that Comer Hospital was the better facility for an evaluation of AA. *Id.*

Later that day, Ilic received an email from Dr. Ramaiah at Comer Children's Hospital. *Id.* at ¶ 36. She is a child abuse pediatrician. *Id.* at ¶ 5.

Dr. Ramaiah summarized the medical records about the visits by the children to that hospital. *Id.* at ¶ 36. She commented that "there are a lot of visits," and that "[s]ome seem legitimate and some seem out of proportion." *See* Defs.' Ex. 12 (Dckt. No. 82-16).

Dr. Ramaiah opined that the "*pattern seen here is highly concerning for MCA*," meaning medical child abuse. *Id.* (emphasis added). "I completely understand and *agree with your concerns for MCA* especially in light of hearing about even[t]s occurring outside of COMER and information you have obtained from other physicians." *Id.* (emphasis added).

On this record, that's a sufficient basis for a reasonable caseworker to believe that AA remained at risk, especially in light of all of the other facts known at the time.

True, the Juvenile Court ruled on September 23 that there was no probable cause, and dismissed the first CHINS petition. *See* Defs.' Ex. 29 (Dckt. No. 83-7) (the order dated Sept. 23, 2019); Pls.' Resp. to Defs.' Statement of Facts, at ¶ 30 (Dckt. No. 93). And AA went to Comer Hospital on September 30, only one week later.

But something important happened in the meantime. Ilic continued to gather and evaluate the medical records. On September 25, Ilic received the email from Dr. Ramaiah, who expressed concern that AA was a victim of medical child abuse.

Ilic and Lara have qualified immunity because they had probable cause to believe that AA was at risk of harm. But the Dalla Costas stumble at the second step of the qualified immunity two-step, too. They have not shown that Ilic and Lara violated clearly established law.

Again, the standard is high. "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Plaintiffs have the burden to defeat qualified immunity "either by identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, not-withstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott v. Sangamon County*, 705 F.3d 706, 723–24 (7th Cir. 2013).

The Dalla Costas devote only one sentence to the issue of clearly established law. They argue that "threats" can give rise to a claim about the loss of custody of children. *See* Resp. Brf., at 14 (Dckt. No. 92). But that level of generality is much too high.

The Dalla Costas cite two cases, but they don't lend a hand. The first case involved a threat to file a motion to compel a blood draw. *See Jerger v. Blaize*, 41 F.4th 910 (7th Cir. 2022). And the parents had to act right away, without counsel. That's not close to the situation in the case at hand.

True, the Seventh Circuit in *Jerger* did say that "[o]ur law, too, is clear that some threats used to obtain compliance with a child welfare investigation violate clearly established constitutional rights." *Id.* at 915. But again, the phrase "some threats" is pretty vague. That proposition is at such a high level of generality that it reaches the atmosphere. It's like saying that "some uses of force" are excessive. *See Zorn*, 607 U.S. ---, 2026 WL 795469, at *2 ("Principles stated generally, such as that 'an officer may not use unreasonable and excessive force,' do not suffice.").

Lifting the hood on *Jerger* shows that it can't take the Dalla Costas very far. The Seventh Circuit in *Jerger* cited three cases when discussing threats. But each of those cases

involved a different claim. They addressed threats that allegedly violated the Fourteenth Amendment, not the Fourth Amendment. *See Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 481 (7th Cir. 2011) (addressing "substantive due process claims"); *Dupuy v. Samuels*, 465 F.3d 757, 758 (7th Cir. 2006) (addressing "parental rights that are protected by the due process clause of the Fourteenth Amendment"); *Doe v. Heck*, 327 F.3d 492, 524 (7th Cir. 2003) (addressing the "right to familial relations").

That's not much of a hook for a Fourth Amendment claim. Cases about the Fourteenth Amendment don't provide clearly established law about the Fourth Amendment.

The other case cited by the Dalla Costas doesn't save the day. *See Brokaw v. Mercer County*, 235 F.3d 1000, 1020 (7th Cir. 2000). They cite a passage of that opinion that discussed procedural due process. Plus, it involved making false statements to a court to obtain the removal of a child, which isn't at issue here. *Id.* at 1021.

In the end, Defendants enjoy qualified immunity on the Fourth Amendment claim about taking AA to Comer Hospital on September 30. A reasonable caseworker would have had probable cause to believe that AA was facing a threat of abuse. The Dalla Costas also have not shown that Defendants violated clearly established law. Ilic and Lara had arguable probable cause, so they have qualified immunity and are entitled to summary judgment.

### C. Substantive Due Process

The third and final claim is a substantive due process claim under the Fourteenth Amendment. *See* First Am. Cplt., at ¶¶ 121–24 (Dckt. No. 26). Plaintiffs bring it against Ilic (only), not Lara.

"The Supreme Court has long recognized, as a component of 'substantive' due process, that parents have a liberty interest in familial relations, which includes the right to 'establish a

home and bring up children' and 'to control the education of their own.'" *See Heck*, 327 F.3d at 517.

Substantive due process isn't exactly a growing legal doctrine. If the doctrine were a stock, you might want to short it. But an exception is familial relations. If it has firm roots anywhere, the foothold of substantive due process in the case law seems the strongest when it comes to the right of parents to raise their children. *See Mirabelli v. Bonta*, 607 U.S. ---, 146 S. Ct. 797, 803 (2026) ("Under long-established precedent, parents – not the State – have primary authority with respect to 'the upbringing and education of children.'"); *id.* at 804 (Barrett, J., concurring) ("[T]he doctrine of substantive due process has long embraced a parent's right to raise her child, which includes the right to participate in significant decisions about her child's mental health."); *see also Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399–400 (1923).

But parental rights have limits. "The constitutional right to familial integrity is not absolute; rather, it must be balanced against the state's interest in protecting children from abuse." *See Siliven*, 635 F.3d at 928.

The state has an interest in protecting children, too. And when it comes to when the state can act, "the standard is even lower" under the Fourteenth Amendment than it is under the Fourth Amendment. *See Mabes*, 136 F.4th at 709; *see also id.* (noting that the Fourteenth Amendment is a "lesser standard").

Under the Fourteenth Amendment, a caseworker only needs reasonable suspicion, not probable cause. *Id.* A caseworker only needs to have "'some definite and articulable evidence giving rise to a reasonable suspicion' of danger to the child before separating them from their parents." *Id.* (quoting *Brokaw*, 235 F.3d at 1019).

41

"'Reasonable suspicion' means that the state actor has 'more than a hunch but less than probable cause.'" *See Gilbank v. Wood County Dep't of Human Serv's*, 111 F.4th 754, 789 (7th Cir. 2024) (citation omitted).

This Court already decided that Ilic had probable cause to remove the children within the meaning of the Fourth Amendment. That conclusion simplifies the analysis, and disposes of the claim under the Fourteenth Amendment.

Ilic had probable cause to remove the children, so she had reasonable suspicion to remove the children (and then some). *See Mabes*, 136 F.4th at 709 ("The lesser standard makes our analysis straightforward: because we have concluded that a reasonable DCS worker could have believed probable cause existed to seize the children, the defendants are entitled to qualified immunity on the Mabeses' substantive due process claim as well."); *Xiong*, 700 F.3d at 291 ("We have already established that a reasonable caseworker could have believed that probable cause existed sufficient to justify the initial decision to remove Thor. Thus, the less demanding standard of 'reasonable suspicion' is met with respect to Wagner's initial decision to remove Thor from the Xiongs' residence."); *Siliven*, 635 F.3d at 928 ("Above, we concluded that that evidence was sufficient to establish probable cause. It follows that it must also be sufficient to satisfy the less demanding reasonable suspicion standard. Therefore, we can find no substantive due process violation.").

The complaint is cryptic, and seems to stretch beyond AA's stay at Comer Hospital from September 30 to October 11. One paragraph accuses Ilic of shifting the burden of proof to the parents, based on the recommendation of Dr. Ramaiah. *See* Am. Cplt., at ¶ 122 (Dckt. No. 26). The following paragraph refers to the "removal of the children" on October 11. *Id.* at ¶ 123 ("Impermissibly shifting the burden of proving their innocence to the parents and conditioning

42

return of the children on an admission to medical child abuse were causes of the removal of the children on October 11, 2019 and continued withholding through December 5, 2019.").

That allegation lacks support in the record. For starters, on October 11, the Juvenile Court "found probable cause to believe that the child is a child in need of services." *See* Defs.' Ex. 33, at 1 (Dckt. No. 83-11). AA then went to foster care. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 65 (Dckt. No. 93); Defs.' Ex. 33, at 2 (Dckt. No. 83-11).

The Della Costas don't explain how Ilic could have lacked probable cause after the Juvenile Court found probable cause (under the Indiana statute, not the Fourth Amendment). The Juvenile Court found that the girls were children in need of services, so it is hard to see how there could be a lack of probable cause under the Fourth Amendment (even if the standard isn't exactly the same). And if probable cause existed, then Ilic can't have liability under the Fourteenth Amendment, either.

Maybe the claim is about the fact that Deborah Dalla Costa lived elsewhere until December 5, when the Juvenile Court dismissed the second CHINS petition. *See* Pls.' Resp. to Defs.' Statement of Facts, at ¶ 70 (Dckt. No. 93). If so, the evidentiary record is too thin to support a claim. Plaintiffs don't point to facts to support the notion that Ilic compelled Deborah Dalla Costa to live elsewhere.

And above all else, Ilic would have qualified immunity even if there was a conceivable constitutional violation. The Della Costas haven't pointed to any clearly established law that should have given Ilic reason to know that her conduct was unlawful.

## Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment.

Date: March 27, 2026

Steven C. Seeger
United States District Judge

44